The **BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ARAPAHOE; the Board of County Commissioners of the County of Adams; and the Board of County Commissioners of the County of Jefferson, Plaintiffs-Appellees,**

v.

The **DENVER BOARD OF WATER COMMISSIONERS; the City and County of Denver, State of Colorado, a municipal corporation; Federico Pena, Mayor; and the Denver Planning Board, Defendants-Appellants.**

No. 83SA252.

Supreme Court of Colorado,
En Banc.

April 7, 1986.
As Modified on Denial of Rehearing
May 12, 1986

Hall & Evans, Raymond J. Connell, Edward H. Widmann, Kevin E. O'Brien, Alan Epstein, Denver, for plaintiffs-appellees.

Stephen Kaplan, City Atty., Brian Goral, Asst. City Atty.; Wayne D. Williams, Michael L. Walker, Casey S. Funk; Gorsuch, Kirgis, Campbell, Walker & Grover, Leonard M. Campbell, Sp. Counsel, Denver, for defendants-appellants.

Susan K. Griffiths, Tami A. Tanoue, Denver, for amicus curiae Colorado Mun. League.

John Dingess, Patrick E. Kowaleski, Office of City Atty., Aurora, for amicus curiae City of Aurora.

James G. Colvin, II, City Atty., Colorado Springs, for amicus curiae City of Colorado Springs.

Broadhurst & Petrock, Kenneth L. Broadhurst, J.J. Petrock, Ronald D. Hutchinson, Frederick A. Fendel, III, Denver, for amicus curiae City of Thornton.

Rothgerber, Appel & Powers, James M. Lyons, Marcia M. Hughes, Denver, for amicus curiae Home Builders Ass'n of Metro Denver.

Robert J. Flynn, Englewood, for amici curiae Southwest Metropolitan Water and Sanitation Dist., Arapahoe, Jefferson and Douglas Counties; Platte Canyon Water and Sanitation Dist., Arapahoe and Jefferson Counties; Willows Water Dist., Arapahoe County; Lakehurst Water and Sanitation Dist., Jefferson and Denver Counties; Cherryridge Water and Sanitation Dist., Arapahoe County; Southwest Suburban Denver Water Dist., Jefferson County.

ROVIRA, Justice.

This case is an appeal from an order of the Denver District Court holding that the Denver Board of Water Commissioners (Board) is a public utility, required to supply water as available to all residents of certain areas within the Denver metropolitan area, and required to comply with the rules and regulations of the Colorado Public Utilities Commission (PUC). We reverse, and hold that, although the Board meets the statutory definition of a public utility, it is not subject to regulation by the PUC or any other entity.

## I.

This suit was initiated by the Board of County Commissioners of Adams, Arapahoe, and Jefferson Counties (Counties) in 1973.[1] The Counties, claiming standing as

---

1. The named plaintiffs before the district court included Jesse and Kathleen Ferge, who alleged that they owned real property that could not be used or developed without water supplied by the Board. In his deposition and at trial, Jesse Ferge testified that his land was zoned agricultural, that it was supplied with water by a well, and that one time when the pipe from his well was broken he called the Board to see if Denver water could be provided to his land. He did not pursue his request for water after he repaired the broken pipe. At the conclusion of the plaintiffs' case, the district court dismissed the claims of Jesse and Kathleen Ferge on the basis that they had not followed any of the usual procedures to obtain water service from

*parens patriae* of their residents and citizens, sought to compel the City and County of Denver (Denver), acting by and through the Board, to supply water as available to all citizens of the Counties and to charge reasonable rates therefor. Further, the Counties asserted that the Board has become a public utility and therefore sought an order requiring the Board to comply with the rules and regulations of the PUC.

Venue was challenged. We ordered venue transferred from the District Court of Arapahoe County to Denver District Court. *Denver Bd. of Water Comm'rs v. Board of County Comm'rs of Arapahoe County,* 187 Colo. 113, 528 P.2d 1305 (1974).

Because of the similarity between the issues here and those determined in *City of Englewood v. City and County of Denver,* 123 Colo. 290, 229 P.2d 667 (1951) (hereafter *Englewood*) (where we held that the Board was not a public utility and not subject to PUC regulation), the trial court issued a pretrial ruling limiting the issues to changes in circumstances occurring since *Englewood* was decided in 1951. At the same time, the court denied the Board's motion to dismiss the Counties for lack of standing. It also dismissed several of the Counties' claims for relief, but at the beginning of the trial reinstated the claim alleging that the Board's actions resulted in an illegal monopoly. Trial of this claim has not yet taken place.

The case was tried in March 1982. After the trial, but before the trial court's ruling, the City of Thornton and various contract distributors (distributors) sought to intervene to protect their interests. The court decided the case in November 1982, granting the Counties' requested relief and denying the motion to intervene.

The Board moved to stay the court's order pending appeal and also moved to reopen the case for the purpose of taking evidence of changed circumstances in light of the Metropolitan Water Development

the Board. The Ferges, the only individual plaintiffs in this action, did not appeal the dismissal.

Agreement of July 1982. The court granted the motion to stay, denied the motion to reopen, and entered final judgment pursuant to C.R.C.P. 54(b), permitting immediate appeal.

## II.

A brief summary of the evidence adduced at trial will be helpful in considering the issues raised by the Board. The primary purpose of the Board has been the development of a water system to serve the citizens of Denver pursuant to the provisions of the City Charter. Denver Charter §§ C4.14–C4.35 (1959). However, for many years, the Board has also furnished water to users outside the Denver city limits by way of distributors' contracts.

Prior to 1959, the Board leased water to outside users on year-to-year contracts pursuant to the City Charter. In 1959, the citizens of Denver amended the City Charter, allowing the Board to enter into water leases which have no time limit with entities outside of Denver. Denver Charter § C4.26 (1959).[2] The Charter, as amended, imposes limitations upon the Board, including a requirement that extraterritorial water leases provide for the payment of sufficient money to reimburse the people of Denver for the cost of furnishing water, plus an additional amount to be determined by the Board. Denver Charter § C4.26. Since 1918, the Charter of Denver has required that such leases provide for limitations of delivery of water to whatever extent may be necessary to enable the Board to provide an adequate supply of water to the people of Denver. Denver Charter § C4.26; Denver Municipal Code § 297B (1927).

Since 1951, the population of Denver and the metropolitan area has substantially increased. Between 1951 and 1982, the Board has maintained its policy of serving areas outside Denver only by way of dis-

2. Charter section C4.26 was part of a comprehensive charter amendment concerning the Board that was submitted to the voters of Denver in May 1959.

tributors' contracts. The increase in population growth led to increased demand for additional water supplies. Comprehensive studies by the Denver Regional Council of Governments (DRCOG) anticipated this future growth, and some municipalities such as Aurora, Glendale, Broomfield, Boulder, Thornton, Federal Heights, Westminster, Englewood, Northglenn, and Golden, and special districts such as Mission Viejo Water and Sanitation District, Willows Water and Sanitation District, and South Adams County Water and Sanitation District, proceeded to develop their own water supplies independent of the Board's system. In addition, some municipalities and special districts, previously furnished water under distributors' contracts with the Board, have severed their relationship with the Board and developed their own supplies. The Counties did not develop their own supplies, although they are constitutionally and statutorily empowered to do so. Colo. Const. art. XIV, § 17; § 30–20–402, 12 C.R.S. (1977).

The Board presently has 114 distributors' contracts with various entities outside Denver's city limits including municipalities, quasi-municipal special districts, private companies, and individuals. These distributors' contracts are in three different formats: Total Service, Read and Bill, and Master Meter. In addition, the Board serves a small number of individuals by way of connector agreements.

In a Total Service Contract, the Board has the responsibility of operating, maintaining, and replacing the distribution facilities within that district and the individual customer pays the Board for the water service. More work and costs for the Board are associated with this type of contract than with any other contract.

In a Read and Bill Contract, the distributor is responsible for operations, maintenance, and replacement of distribution facilities. The Board reads each individual meter and bills individual customers directly. These distributors assess their own tap fees, install their own facilities, and issue bonds to pay for any improvements.

In a Master Meter Contract, the Board delivers treated water to the periphery of the district. The distributor has the responsibility for operations, maintenance, replacement of the distribution facilities, billing, and collecting from each individual customer. Master Meter distributors charge their own rates, assess their own tap fees, install their own facilities, and issue bonds to pay for any improvements.

In 1980, 71 billion gallons of water were treated and delivered by the Board. Of this amount, nearly 46 billion gallons (60%) were utilized inside Denver. Of the 25 billion gallons of treated water delivered outside Denver, 50% was delivered to Master Meter distributors, 29% to Read and Bill distributors, and 21% to Total Service distributors.

All distributors' contracts contain a description of the contract service area eligible to receive water from the Board. To amend this contract service area, a property owner petitions the distributor. If the request is approved, the distributor then refers the request to the staff of the Board. The staff proceeds with a review process and solicits comments from various local, state, and county agencies, including the planning commission of the county involved, the Denver Planning Commission, DRCOG and other interested local agencies. The Board then acts upon the request, taking into account all comments it has received. However, under the terms of its distributor contracts the Board cannot grant a service area expansion without the prior approval of the distributor.

Between September 1973, when the complaint in this case was filed, and September 1981, a total of 4,495.63 acres or in excess of 7 square miles were included in contract service areas located in the Counties. Of the total, 1,394.67 acres were in Arapahoe County, 3,072.64 acres in Jefferson County, and 28.32 acres in Adams County. In addition, the settlement of an annexation case established eligibility for a contract service area of an additional 2,080 acres in Adams County.

Within the contract service area, competitive suppliers may, by a separate system, provide water service to that area. However, in order to ensure that water quality is maintained, Board distributor contracts prohibit commingling of Board supplied water with water from other sources. With the exception of this provision against interconnection between systems, Board contracts neither reserve to the Board nor allocate to a distributor the exclusive privilege of supplying a given service area.

The effects of drought on water supply in Colorado are well known. The impact of drought on municipalities has resulted in lawn watering restrictions, moratoriums on service, and other restrictions on use to conserve water. A drought in the 1950's was so severe that the Board restricted use by temporarily creating a "Blue Line" beyond which water service would not be extended, and within which service was not assured.

As a result of the drought crisis of 1976 and 1977, the Board adopted water restrictions and a Tap Allocation Program which established procedures and criteria to allocate new taps among the various entities under contract outside Denver which are served by the Board's water system.

The Tap Allocation Program is based on the number of taps the Board can put on its system and not exceed the safe annual yield of 295,000 acre feet by the end of the year 1986. At the time of trial, the Board estimated that 7,000 taps per year were available to the Board's water system. Under the Tap Allocation Program, residents of Denver were entitled to any and all taps they could use, and the remainder of the 7,000 taps were available annually to contract distributors outside of Denver.

The Tap Allocation Program is structured so that the taps not used in Denver will be allocated to those distributors which have shown a history of growth and have the potential to grow more in the future. Contract distributors are classified according to their potential for growth. Category A distributors are those which have signed a participation agreement with the Board.

A participation agreement is a contract with the Board to share front end costs for distribution facilities. The Board, by placing a distributor in Category A, recognizes a distributor's advance payment of costs, and the Board reserves a specific number of taps for that distributor.

Category B and C distributors have not signed a participation agreement. They have less open space for development and, according to the Board, a history of less need for taps. B and C distributors, nevertheless, receive an allocation of taps; and in some cases, B distributors receive more taps than A distributors. In fact, as to Category C distributors, in the five years prior to trial, 32 distributors had not needed any taps; 24 used fewer than five taps; 11 purchased between six and ten taps; and 11 purchased between eleven and fifteen taps.

Forty percent of all the water distributed by the Board is now delivered to users outside the boundaries of Denver. The Board's staff estimated that by the year 2014, eighty percent of its water consumers will reside outside Denver.

In a pretrial order, the Board admitted that it operates an integrated water system and that more than half of its operating revenue is derived from areas located outside Denver. Further, in applying for and submitting claims for water rights, the Board represented that the water might be used, in part, outside Denver.

The evidence also established that, once a water district was formed and entered into a contract with the Board, the Board held itself out as ready and willing to serve all who requested water within the district's contract service area. In 1977, the Board reaffirmed its policy to develop water rights and to construct facilities to deliver water to the Denver metropolitan area.

The trial court made extensive findings of fact and based its conclusion that the Board is a public utility subject to PUC jurisdiction on a number of factors which it

believed differentiated the situation here from that found in *Englewood* in 1951.

The court first found that the changes in Denver's City Charter provisions had resulted in a proliferation of extraterritorial water supply contracts whose long-term nature made them different in character from the one-year contracts considered in *Englewood*. Although the trial court found no evidence that the Board has ever attempted to keep competitive water suppliers out of any distributor's contract service area, it concluded that the terms of its contracts give the Board "total control" over the operations of the contracting water districts. Since the contracts prevent commingling of Board-supplied water with water from other sources, the court found that they also make the Board the "exclusive supplier of water" to the contract service areas.

Second, the increased volume of the Board's extraterritorial distributions had raised its revenues from outside sources above those attributable to inside sales. The court also determined that, as a result of the rapid growth of outside sales, the volume of water delivered to outside users will soon exceed the volume delivered to Denver residents. On this basis, the court determined that the Board's extraterritorial service was no longer incidental to its purpose of supplying water to Denver residents.

Third, since the Board was the only entity with the ability and the capacity to supply the needs of unincorporated areas within the Denver metropolitan area, it had an "effective monopoly" over service to currently unserved areas. In so finding, the court defined the metropolitan area to include the City and County of Denver, all contract service areas of the Board, specified urban service areas within each of the three Counties, and all enclaves within the areas described above. It excluded areas within incorporated municipalities which supply their own water from sources other than the Board.

Fourth, in establishing the "Blue Line" and later in negotiating contracts with in-

dependent water districts, the Board held itself out to serve any and all persons who desired service within the Blue Line and within contracting districts. The court also found that the lifting of the Blue Line in 1962 and the expansion of the Board's ability to serve suburban areas were evidence that the Board was "staking out" the metropolitan area as its service area.

Based on its findings, the trial court concluded that, "[t]he evidence has most extensively, most substantially and most pertinently shown changed circumstances from those adjudicated in *Englewood*." (Citation omitted). On the basis of these changed circumstances, the court determined that the "Board has become a public utility, subject to PUC regulation to the extent of any water available for use beyond the needs of Denver residents" and that the Board's "activities ... in delivery of water and taps outside Denver limits, is a direct interference with the [Counties'] primary governmental function in planning and zoning."

The Board challenges the trial court's decision on a number of grounds. First, the Board renews its contention that the Counties lack standing to bring this action. Second, it argues that the trial court erred in holding that the Board was a public utility subject to PUC regulation. Third, it contends that even if the Board is a public utility, its Tap Allocation Program was a reasonable method of allocating finite water resources, and therefore any denial of taps under the Program was a denial for utility related reasons and is therefore unassailable by the Counties. Finally, the Board asserts that the trial court erred in refusing both to join various contract distributors as indispensable parties and to reopen the case to receive new evidence. We consider each of these contentions in turn.

### III.

We first address the Board's contention that the Counties lack standing to bring this action. The Counties present two theories under which they claim standing.

First, they claim standing to assert the interests of their citizens and residents under the doctrine of *parens patriae.* In the alternative, the Counties argue that they have standing to sue to protect their own interests under the doctrine adopted in *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977). After reviewing these claims, we reject the Counties' assertion of standing as *parens patriae,* but conclude that the Counties have standing to bring this action under the *Wimberly* test.

The basis of the *parens patriae* doctrine is the combination of sovereign capacity of the state and incompetence of citizens to act for themselves in the matter. *People ex rel. the Attorney General v. Tool,* 35 Colo. 225, 236, 86 P. 224 (1905); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600–01, 102 S.Ct. 3260, 3265, 73 L.Ed.2d 995 (1982). Thus, the state, in its sovereign capacity, may maintain a suit on behalf of its citizens as *parens patriae* to protect their rights.

█ However, counties, unlike states, are not independent governmental entities existing by reason of any inherent sovereign authority of their residents. *Board of County Comm'rs v. Love,* 172 Colo. 121, 125, 470 P.2d 861, 862 (1970). They are political subdivisions of the state with only such powers as the state delegates to them. *Board of County Comm'rs v. Pfeifer,* 190 Colo. 275, 278, 546 P.2d 946, 947 (1976); *Love,* 172 Colo. at 125, 470 P.2d at 862. Without belaboring the point, we hold that counties lack the element of sovereignty that is a necessary prerequisite for *parens patriae* standing. *See In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *6A Moore's Federal Practice 2d* ¶ 57.11 n. 39 (1985).

█ Although the lack of sovereignty prevents the Counties from pursuing this action as *parens patriae,* we hold that under the circumstances present here the Counties do have standing to pursue this action in their own right.

All parties agree that the proper inquiry in determining whether a party has standing is "whether the plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions." *Wimberly,* 194 Colo. at 168, 570 P.2d at 539. In this action, the Counties assert that the Board is operating within the Counties as a public utility but is unsupervised by the PUC. They claim that the activities of the Board have interfered with their legally protected statutory interests in providing water services within the Counties and in planning and determining land use.

In assessing whether a party has demonstrated actual injury, we first look to the complaint and accept as true all averments of material fact. *State Bd. for Community Colleges v. Olson,* 687 P.2d 429, 434 (Colo.1984). In their complaint, the Counties allege that the failure of the Board to provide water has hampered planned development with the Counties, and the development of undeveloped land is dependent on the land being supplied with water. They also allege that they relied on Board representations and assurances that "water service would be available on reasonable and equal terms" to properties located within the Counties. As a result of these representations and the Board's past conduct, the Counties did not develop water distribution systems or purchase water rights to provide water to their citizens and are now unable to do so. Finally, they allege that the denial of water supplies to areas within the Counties interferes with their right to plan and zone property within County limits.

It is beyond dispute that the legislature has in fact granted counties power to construct, improve, and extend water facilities within and without the county and to control land use within unincorporated areas. *See, e.g.,* §§ 30–20–402(1) (power to provide water facilities), 30–28–103 (power to plan and develop unincorporated territories), 30–28–111 (power to zone), and 30–28–115(1) (power to classify land uses), 12 C.R.S. (1977 & 1985 Supp.); *see also Board of County Comm'rs v. City of Thornton,* 629

P.2d 605 (Colo.1981); *Robinson v. City of Boulder*, 190 Colo. 357, 547 P.2d 228 (1976). Here, the injury alleged by the Counties is that the lack of water limits the uses to which the land may be put and interferes with uses of land that the counties may have determined would be appropriate. The Counties' allegations of injury in fact are sufficient to meet the first part of the *Wimberly* test.

Our next task is to determine whether their interest is legally protected. In *Cloverleaf Kennel Club v. Colorado Racing Comm'n*, 620 P.2d 1051, 1058 (Colo.1980), we adopted three guidelines for ascertaining whether an asserted interest is protected by statute: first, whether the statute creates a right in favor of the plaintiff; second, whether there is any indication of legislative intent, explicit or implicit, to create a remedy or deny one; third, whether an implied remedy is consistent with the underlying purposes of the legislative scheme. *Id.* (quoting *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975)).

Section 30–20–402(1), 12 C.R.S. (1977), gives counties the power to provide water services both within and without their territorial limits. The Counties allege that the Board's methods of operation made it the *de facto* exclusive supplier of water to the contract service areas, thereby interfering with their ability to provide water service and effectively preventing the Counties from exercising their water supply power and developing their own supplies for those areas. Section 30–11–101(1)(a), 12 C.R.S. (1977), authorizes a county to sue. Section 30–20–402(1)(i), 12 C.R.S. (1977), adds the power to "make all contracts, execute all instruments, and do all things necessary or convenient in the exercise of the powers granted in this section...." While this language may not be sufficient to constitute an express right to sue in order to remedy an impairment to the Counties' water supply power, it indicates an implicit legislative intent to allow such suits. The right to redress such an impairment is also consistent with the policy, implicit in the enactment of title 30, article 20, part 4, 12

C.R.S. (1977), of encouraging counties to develop water and sewer systems to serve residents of their unincorporated areas. Therefore, under the *Cloverleaf Kennel Club* guidelines, the Counties have standing to bring this action. Since the Counties have a legally protected interest under section 30–20–402(1), we need not consider whether the statutory sections implicated in their claims of impairment to zoning and planning powers also provide standing. However, it is worthy of note that the trial court determined that the Board's activities interfered with the Counties' governmental function of planning and zoning.

IV.

The Board next contends that the trial court erred in holding that it is a public utility subject to PUC regulation. This claim raises two issues for resolution. First, whether the court was correct in concluding that the Board is a public utility. Second, if the Board is a public utility, whether the PUC or any other body has the constitutional and statutory authority to regulate the activities of the Board, or require it to supply water as available to all persons within the metropolitan area who request service. We will deal with these issues in turn.

A. *Status of the Board*

In *City of Englewood v. City and County of Denver*, 123 Colo. 290, 300, 229 P.2d 667, 672–73 (1951), we adopted the following test for determining public utility status:

[T]o fall into the class of a public utility, a business or enterprise must be impressed with a public interest and that those engaged in the conduct thereof must hold themselves out as serving or ready to serve all members of the public, who may require it, to the extent of their capacity. The nature of the service must be such that all members of the public have an enforceable right to demand it.

In *Englewood*, we applied this test to the operations of the Board, and determined

that, at the time of that suit, the Board was not a public utility and not subject to regulation by the PUC.

In reaching a contrary determination, the trial court concluded that changed circumstances since 1951 have altered the Water Board's status under the *Englewood* test. The court placed great emphasis on our decision in *Robinson v. City of Boulder*, 190 Colo. 357, 547 P.2d 228 (1976). In that case, we found that the City of Boulder, in supplying water to the Gunbarrel Hill development outside its territorial limits, was acting as a public utility.

In *Robinson*, we applied the *Englewood* standard, but we distinguished Boulder's conduct from Denver's situation in *Englewood* on a number of grounds. First, we noted that in *Englewood* the Board's extraterritorial operations were wholly incidental to the operation of the city's water system, which was established for the purpose of supplying Denver inhabitants. We further distinguished the *Englewood* situation by recognizing that, unlike Boulder's approach to the Gunbarrel Hill development, the Board did not "stake out" territory and seek to become the sole supplier in that territory. Finally, we relied on the trial court's finding that "the City of Boulder had dedicated its water and sewer service to public use to benefit both the inhabitants of Boulder and the residents of the Gunbarrel Hill area in the interest of controlling the growth of the [Boulder metropolitan] area and to provide living qualities which the City deem[ed] desirable." *Robinson*, 190 Colo. at 360, 547 P.2d at 230. With these distinguishing features in mind, we concluded that Boulder met the *Englewood* test for acceding to public utility status by holding itself out as "being ready to serve all members of the public to the extent of its capacity." 190 Colo. at 359, 547 P.2d at 229.

Although we used the *Englewood* test in deciding *Robinson*, we now conclude that *Englewood* no longer provides the appro-priate test for determining public utility status. The people of Colorado, through the constitution and the statutes adopted by their representatives, have established a comprehensive scheme for the regulation of public utilities by the PUC. *See* Colo. Const. art. XXV; title 40, arts. 1-7, 17 C.R.S. (1984 & 1985 Supp.). With certain exceptions provided in the constitution and the statutes (*e.g.,* Colo. Const. art. V, § 35; Colo. Const. art. XXV; § 31-35-402(1)(f), 12 C.R.S. (1977); § 40-1-103(1)(b), 17 C.R.S. (1984)), article XXV of the Colorado Constitution provides the PUC with "all power to regulate the facilities, service, rates and charges" of all public utilities.[3] A comprehensive regulatory scheme, such as the one set forth in these constitutional and statutory provisions, indicates a legislative intent that the statutes supersede and replace the preexisting common law in the regulated area. 2A N.J. Singer, *Sutherland Statutory Construction* § 50.05 n. 5 (rev. 4th ed. 1984). Whether a particular entity is or is not a public utility should therefore be analyzed, at least at first, from the standpoint of whether the entity is a public utility within the contemplation of the constitution and the statutes concerning the PUC and, if so, whether that public utility is exempted from regulation by the constitution or by a statute.

Although the constitution does not define "public utility," the term is broadly defined in the PUC's organic statutes:

> The term *"public utility"*, when used in articles 1 to 7 of this title, *includes every* common carrier, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, *water corporation, person, or municipality operating for the purpose of supplying the public* for domestic, mechanical, or public uses and every corporation, or person declared by law to be affected with a public interest, and each of the preceding is hereby declared to be a public utility and to be subject to the jurisdic-

---

3. Colo. Const. art. XXV was added to the constitution on November 3, 1954, three years after our holding in *Englewood*.

tion, control, and regulation of the commission and to the provisions of articles 1 to 7 of this title.

Section 40–1–103(1)(a), 17 C.R.S. (1984) (emphasis supplied). Based on the evidence and the trial court's findings, the Board, when supplying water to customers inside and outside of Denver's territorial limits, clearly fits this definition of a "public utility." *Cf. City and County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730 (Colo.1985) (concerning the authority of Denver to provide water service outside its municipal boundaries). Because this statutory definition displaces *Englewood's* common law test, we need not review the trial court's application of the *Englewood* and *Robinson* standards.

B. *Regulatory Jurisdiction Over the Board*

Since the Board is a public utility as defined by section 40–1–103(1)(a), 17 C.R.S. (1984), we need to address the issue of regulatory jurisdiction. We must therefore inquire whether either the constitution or statutes have created an exemption from regulation for Denver's service of water to customers outside its territorial limits.

The Board argues that municipally owned water utilities serving outside their territorial boundaries are constitutionally exempt from regulation. Although the Board concedes that article XXV of the Colorado Constitution gives the PUC authority to regulate private investor utilities within home rule cities, it contends that article XXV does not extend that regulatory authority to municipally owned water and sewer utilities. In so arguing, the Board notes the following proviso in article XXV:

> Until such time as the General Assembly may otherwise designate, said authority [to regulate public utilities operating in Colorado] shall be vested in the Public Utilities Commission of the State of Colorado; provided however ... that nothing herein shall be construed to apply to municipally owned utilities.

The Board also relies on a second constitutional provision in arguing that the PUC lacks jurisdiction to regulate its activities. Article V, section 35, of the Colorado Constitution states that

> The general assembly shall not delegate to any special commission ... any power to make, supervise or interfere with any municipal improvement, money, property, or effects, ... or perform any municipal function whatever.

The PUC is a "special commission" under article V. *City of Lamar v. Town of Wiley*, 80 Colo. 18, 248 P. 1009 (1926).

■ Contrary to the Board's arguments, the Colorado Constitution does not prohibit PUC regulation of the Board's extraterritorial delivery of water. Our past decisions and the provisions in article V, section 35, and article XXV of the Colorado Constitution preclude only PUC, or other, regulation of municipally owned utility service *within* municipal boundaries. *See City of Loveland v. PUC*, 195 Colo. 298, 580 P.2d 381 (1978) (electricity rates); *City and County of Denver v. PUC*, 181 Colo. 38, 507 P.2d 871 (1973) (mass transit rates and service); *City of Lamar v. Town of Wiley*, 80 Colo. 18, 248 P. 1009 (1926) (electricity rates); *Town of Holyoke v. Smith*, 75 Colo. 286, 226 P. 158 (1924) (electricity rates). The Board attempts to distinguish these cases by asserting that PUC jurisdiction over extraterritorial operations of municipal utilities depends on the particular utility activity conducted. In support of this argument, the Board notes our conclusion that the Board was not subject to PUC regulation in *Englewood:*

> Denver holds such water as is not needed by it for immediate use in its proprietary capacity, in which it has a well defined property right; and section 35 of Article V of the Colorado Constitution ... withholds from the legislature all power to dedicate to any commission any supervision of this property right, thus precluding any jurisdiction of the Public Utilities Commission.

123 Colo. at 301, 229 P.2d at 673. In *Englewood*, we distinguished *Lamar* on the basis of the type of utility service provided:

[T]he Lamar case involved the furnishing of electric current to the neighboring town of Wiley. While we do not pause to explore the field of distinction between supplying water and that of supplying electric current, it may be said that a great distinction would be found to exist. *Englewood*, 123 Colo. at 296, 229 P.2d at 671.

In reviewing *Englewood* and both article V, section 35, and article XXV of the constitution, we find nothing in the constitutional provisions themselves that distinguishes PUC jurisdiction over an extraterritorial municipal water utility from the PUC's authority to regulate any other type of extraterritorial municipal utility. That part of the *Englewood* opinion dealing with the regulatory jurisdiction of the PUC, including the distinction between supplying water and electricity quoted above, was dicta and therefore not binding on this court since we had already concluded that the Board was not a public utility. *See* 123 Colo. at 300–01, 229 P.2d at 673. To the extent we indicated a constitutional distinction between water providers and other utilities in dicta, without explanation or analysis, we find no principled basis for adhering to that distinction here. We therefore reject the Board's contention that it is constitutionally exempt from regulation.

■ However, the statutes, particularly section 31–35–402(1), 12 C.R.S. (1977), do make a distinction with respect to extraterritorial water service by municipalities. Based on section 31–35–402(1), the Board argues that it is the public policy of this state that municipal utilities have total authority over the provision of water service to users inside and outside municipal boundaries. We agree.

Section 31–35–402(1), 12 C.R.S. (1977), provides, in pertinent part:

In addition to the powers which it may now have, any municipality, without any election of the qualified electors thereof, has power ...

(a) To acquire ... to construct, to reconstruct, to improve, to better, and to extend water facilities or sewerage facilities or both, *wholly within or wholly without the municipality, or partially within and partially without the municipality ...*

(b) To operate and maintain water facilities or sewerage facilities or both *for its own use and for the use of* public and private *consumers and users within and without the territorial boundaries of the municipality ...*

....

(f) To prescribe, revise, and collect ... from any consumer or any owner or occupant of any real property connected therewith or receiving service therefrom, rates, fees, tolls, and charges or any combination thereof for the services furnished by, or the direct or indirect connection with, or the use of, or any commodity from such water facilities or sewerage facilities or both ... *without any modification, supervision, or regulation* of any such rates, fees, tolls, or charges *by any board, agency, bureau, commission, or official* other than the governing body collecting them....

§ 31–35–402(1), 12 C.R.S. (1977) (emphasis supplied); *see also* Colo. Const. art. XXV (the PUC has *all* power to regulate public utilities "[u]ntil such time as the General Assembly may otherwise designate."). While section 31–35–402(1) explicitly prohibits only regulation of "rates, fees, tolls, or charges" for that service, there seems to be no basis or reason for PUC or other regulation of utility service in the absence of rate regulation, and we do not presume the legislature intended such a result.

We applied article XXV; article V, section 35; and the prior codification of section 31–35–402, 12 C.R.S. (1977),[4] in *City of Thornton v. PUC*, 157 Colo. 188, 402 P.2d 194 (1965). On the basis of those provisions, we concluded that the PUC lacked jurisdiction to interfere with the purchase and operation of water facilities which served consumers both inside and outside

4. § 139–52–2, 7 C.R.S. (1963).

the City of Thornton. We believe that this same conclusion applies to the case at bar.

Both the trial court and the Counties rely on our decision in *Robinson v. City of Boulder,* 190 Colo. 357, 547 P.2d 228 (1976), as the basis for distinguishing *Englewood* and *Thornton* and finding PUC jurisdiction over the Board. Indeed, the trial court commented that the decision in *Robinson* "crystallized the law to the effect that a city serving water to outsiders may become a PUC regulated utility." In so concluding, the trial court misread the *Robinson* opinion.

Although it applied the no longer appropriate *Englewood* test for determining public utility status, *Robinson* does indeed stand for the proposition that a municipal water system may accede to public utility status. *See Robinson,* 190 Colo. at 359–60, 547 P.2d at 229–30. However, nothing in the language of the *Robinson* opinion suggests that once public utility status is conferred, the municipal water provider is then subject to PUC regulation. In fact, the PUC is not mentioned in the opinion. The issue of PUC jurisdiction was simply never before the court in *Robinson.* Any reliance on that opinion to either support or deny PUC jurisdiction is therefore mistaken.

Moreover, implicit in *Englewood* and explicit in *Robinson* is a belief that the courts of Colorado have the authority to declare an entity to be a public utility under some common law test and to order a court-supervised regulatory remedy, even in the face of the comprehensive constitutional and statutory scheme for PUC regulation of public utilities and the strong and clear expression of intention by the legislature to exempt municipalities from regulation in connection with extraterritorial water service. However, the general assembly did not simply prevent PUC regulation over extraterritorial water service by a municipality in section 31–35–402(1)(f). Rather, it prohibited "any board, agency, bureau, commission, or official" from regulating that service. § 31–35–402(1)(f), 12 C.R.S. (1977). Given this clear expression of in-

tent by the legislature that a municipality's governing body is to retain sole control over extraterritorial water service without interference from any source, we now hold that neither the PUC nor any other board, agency, bureau, commission, or official has authority to regulate municipally owned water service. Therefore, to the extent that *Englewood* and *Robinson* reach a contrary conclusion, those opinions no longer represent Colorado law.

We further conclude that since the court's findings concerning the Tap Allocation Program did not lead to an order of relief adverse to the Board's interests other than the regulatory relief that has been struck down, we need not review the validity of these findings.

## V.

The Board and several amici curiae also assert that contract distributor rights might be impaired by the trial court's decision to subject the Board to PUC regulation and, therefore, contend that contracting districts should have been joined as indispensable parties under C.R.C.P. 19(a). Since we have concluded that the Board is not subject to regulation, any threat of contractual impairment is now moot. Therefore, we need not consider the Board's compulsory joinder claim. For the same reason, we need not address the denial of the Board's motion to reopen the case to receive new evidence.

Accordingly, we reverse the judgment of the district court and remand for further proceedings, if any, that are still pending before the district court.