**SOUTHGATE WATER DISTRICT, ARAPAHOE AND DOUGLAS COUNTIES, Colorado, a quasi-municipal corporation, Plaintiff–Appellant,**

v.

**CITY AND COUNTY OF DENVER, a municipal corporation, acting By and Through its BOARD OF WATER COMMISSIONERS, Defendant–Appellee.**

No. 89CA1719.

Colorado Court of Appeals, Div. II.

Dec. 31, 1992.

Rehearing Denied Feb. 4, 1993.

Banta, Hoyt, Greene & Everall, P.C., Charles A. Kuechenmeister, Stephen G. Everall, John L. Palmquist, Deutsch & Sheldon, Michael A. Sheldon, John M. Spillane, Englewood, for plaintiff-appellant.

Patricia L. Wells, Michael L. Walker, Anne R. Avery, Mary K. Brennan, Denver, for defendant-appellee.

Harding & Ogborn, Timothy C. Terrill, Sherri A. Heckel, Denver, amicus curiae for Metro Denver Water Authority.

Griffiths & Tanoue, P.C., Tami A. Tanoue, Denver, amicus curiae for City of Thornton.

James G. Colvin, III, City Atty., Colorado Springs, amicus curiae for City of Colorado Springs.

Ankele, Icenogle, Slattery & Norton, P.C., Charles E. Norton, T. Edward Icenogle, William P. Ankele, Jr., Denver, Deutsch & Sheldon, Michael A. Sheldon, John M. Spillane, Englewood, amicus curiae for Castlewood Water Dist.

Opinion by Judge REED.

In this action for declaratory relief, the controversy at issue concerns the validity of various monetary charges imposed upon plaintiff, the Southgate Water District, under a written Participation Agreement between it and defendant, the City and County of Denver, acting through its Board of Water Commissioners. We affirm in part and vacate in part.

Under the terms of the agreement at issue, Denver constructed an extension to and enlargement of its water distribution facilities to supply treated water to an area located outside Denver's city limits, part of which is serviced by Southgate. Thereafter, disputes arose between the parties as to the charges made by Denver for Southgate's share of the construction costs under the agreement. As a result, Southgate instituted the present action seeking declaratory relief as to some of these items (some of which had been paid by Southgate and for which reimbursement was sought).

Specifically, Southgate claims that certain "participation charges" made by Denver were in breach of the written agreement because they were in excess of the actual cost of construction attributable to Southgate's use of the extended system. Except as to certain items which are not the subject of this appeal, the trial court found that these disputed charges were in compliance with the agreement and that Southgate was liable therefor. As to these charges, we affirm the ruling of the trial court.

Southgate also contends that other charges for particular items of administrative expenses, allocation of overhead, and damage claims are not authorized under the contract and challenges the trial court's denial of its claims regarding such charges. As to this portion of the judgment, we affirm in part and vacate in part.

In addition to its claims for breach of contract, Southgate contends that Denver, in supplying water to Southgate's service area and in charging for the construction costs attendant thereto, was operating as a public utility. It thus sought a judicial declaration that the participation charges, notwithstanding Southgate's agreement to them in the written contract, violate the standards of reasonableness applicable to utility rate making because they did not appropriately reflect the cost of service to

Southgate or to its utilization of the system. Accordingly, it sought judicial review of those charges to conform to a "reasonable" standard.

With respect to these claims, the trial court's judgment declared that Southgate was liable on the basis of its contractual agreement and that the provisions of § 31-35-402(1)(f), C.R.S. (1986 Repl.Vol. 12B) preclude judicial review as to the reasonableness of the same. We agree and affirm the judgment of the trial court dismissing Southgate's claim for judicial review.

I.

In this case, Southgate, a quasi-municipal corporation organized under the Colorado Special District Act, § 32-1-101, et seq., C.R.S., was the purchaser and distributor of water supplied by defendant, the City and County of Denver. At all relevant times, Denver was acting through its Board of Water Commissioners (Water Board), which is responsible for setting rates and charges for water service customers inside and outside the municipal limits.

The Participation Agreement at issue here was signed January 26, 1982. Before that time, by attachment to and extension of Denver's integrated system into the Southgate area, Denver supplied water to Southgate pursuant to two successive distributorship contracts entered into in July 1961 and April 1981. By the terms of these agreements, Denver was granted the exclusive right to supply water to Southgate for service to the latter's customers in Arapahoe and Douglas counties. Denver, in turn, was obligated to continue this service as long as it had surplus water available after satisfying the needs of the Denver inhabitants. This contractual undertaking was for an indefinite duration, subject to rights of termination including that by mutual consent.

By the early 1980's, many areas within the Southgate service area were preparing for further development, and Southgate, under the existing system, had neither the capacity to meet contemplated peak load demand nor the ability to operate its water system to render optimum service at the area's ultimate development.

As a result, Southgate sought to make additional contractual arrangements with Denver for the latter physically to expand its facilities within the Southgate area. This included extension of existing conduits and increasing the storage capacity to supply the expanded system.

Thus, a series of negotiations took place during 1980 and 1981 between Southgate and Denver, which resulted in the Participation Agreement at issue here. That contract identified seven major water facilities necessary to alleviate existing service problems and accommodate new development in Southgate. It provided that Denver was required to construct transmission, pumping, and storage facilities, including additional reservoir and pumping capacity and the extension of both main line and interconnecting conduit, to achieve an integrated or looped system of distribution fed by several reservoirs.

In order to meet the anticipated demands of other water districts also located in this general area, the contract included a provision that Denver would construct the new facilities larger than that necessary to meet the requirements of Southgate alone. A further condition was that, in the event the parties were unable to agree regarding design criteria, Denver's engineering analysis involved in sizing and costs of each component facility would prevail. The contract also provided that title to the facilities would vest in Denver upon completion of construction.

The actual facilities to be constructed as outlined under the contract are: a 48-inch conduit, no. 55; a 60-inch conduit, no. 111; a 48-inch conduit, no. 128; a 60-inch conduit, no. 111, phase I; Lone Tree reservoir; Lone Tree pump station (with specified structure and capacity); and Highlands pump station (with specified structures and capacity).

The contract contained a specific schedule in which each of these facilities is list-

ed. As to each facility there is set forth the estimated total cost, *the percentage of the actual costs that Southgate is obligated to pay* (and the estimate thereof), and the portion of the total costs to be borne by Denver and another water district.

One of the major issues on appeal concerns the charges for the conduits and the method by which they were computed under the contract.

Central to this issue is the undisputed fact that, with the knowledge of both parties, the conduits were described in the contract as, and were built, "oversize," that is, in excess of Southgate's needs. This allowed excess capacity in the system for Denver's sale to third parties.

In order to compute the percentage of total cost to be paid by Southgate, there was first computed the estimated cost of a conduit to meet the capacity requirements of Southgate alone. This figure was then divided by the estimated cost of the oversize conduit to be built. This resulted in an agreed percentage of the actual costs of the oversized conduit to be paid by Southgate.

This method of calculation had the effect of granting to Denver the benefit of the economics of scale resulting from the construction of the larger unit. According to Southgate, this procedure imposed upon it charges in excess of its share of "actual costs."

For example, Southgate contends that if conduit no. 55 had been built "stand alone," that is, to meet its capacity requirements alone, a 30–inch conduit would suffice. However, because it was built oversize, *i.e.,* at 48–inch, Denver realized an excess capacity for future resale. Thus, Southgate argues that if the capacity of the "stand alone" conduit is compared with that of the oversized conduit, and the cost allocated accordingly, Southgate's share of the actual costs would be much less than that charged under the contract. It contends that this failure to apportion actual costs according to capacity is contrary to the terms of the agreement and violates the

standard of reasonableness imposed in the pricing of utility services.

Another major item of disputed participation charges relates to the per-tap assessment for storage capacity in and service from a reservoir which had been built by Denver some years before the Participation Agreement. Because this reservoir is not a newly constructed facility, a separate charge was made in the contract for pumping and storage use based upon a per-tap equivalent basis.

In essence, the tap assessment reflected a standard charge used in previous participation agreements rather than on the actual costs of construction of the reservoir in 1974. The mode of calculation in the contract was based upon a 1977 cost estimate for storage per million gallons of water. This estimate was in turn modified by other construction to the reservoir and its pumping station in 1981 and for inflationary factors.

Because the cost of construction per million gallons of water was substantially less when the reservoir was built, Southgate contends that this charge is unreasonable.

II.

Southgate contends that the trial court erred in denying its claim that Denver breached the Participation Agreement by calculating the conduit and Highlands Reservoir charges without reference to actual costs. We are not persuaded.

A.

Conduits

The contract listed and described each new water main or conduit facility to be constructed by Denver. It also specified points of connection to existing facilities, size and location of conduit to be installed, and special features such as surge tanks and pressure regulating valves.

The trial court found that the schedule of charges embodied in the contract was the product of extensive negotiations between the parties. Even though there was disagreement between them as to which ele-

ments and costs should have been excluded in the formulas for computing the charges, Southgate's precise percentage of actual cost for each facility was set forth in the agreement. Moreover, Southgate was permitted to review and comment upon the engineering design and construction plan for the new facilities, and it could have terminated the contract if dissatisfied with cost estimates established by Denver. Thus, the trial court concluded that Denver was entitled to impose the charges because Southgate had exercised informed judgment with respect to the material terms of the contract, including formulation of the conduit participation charges.

Southgate nevertheless asks us to find that the contract precludes assessment of charges except as they are justified by the capacity reserved for Southgate's use in the actual conduit. Southgate challenges Denver's method of computation which it claims juxtaposed estimated (stand alone) figures with actual cost figures and which had the effect of producing arbitrary distortions of Southgate's participation requirements. To the extent that Southgate questions the use of estimates, we note that the Water Board's Operating Rule 2.044 expressly authorizes the use of estimates in reaching a contract with an applicant for service.

The portion of the contract on which Southgate relies provides as follows:

As a result [of the construction of oversized facilities], the actual cost of constructing the facilities required to meet the *sole* demands of the District will not be available. Instead, it is agreed that the District will pay a percentage of the *total actual cost of constructing each* of the facilities described in Exhibit 'A'. The percentage of actual cost to be paid by the District for each facility is detailed in Exhibit 'B'.... (emphasis added)

This provision must be considered in conjunction with Denver City Charter § C4.26 under which the Water Board is empowered to lease water for use outside the city limits. It also provides that in such circumstances, Denver is required to collect "suf-ficient money to fully reimburse the people of Denver for the costs of furnishing the water [outside Denver] ... *together with an additional amount to be determined by the Board."* (emphasis added) Section C4.26 was made part of the contract and, by the terms of the contract, supersedes any other term in conflict with it.

Further, Operating Rule 2.044 also allows participation charges not only for the cost of the extension to an applicant, but for earlier construction as well. It provides as follows:

Applicants for service ... may ... be required to participate ... in the cost of construction of certain existing Department facilities whose construction was authorized on or after May 13, 1972.

Although both the contract and the Operating Rule 2.044 speak in terms of charging formulas based on actual costs, taken as a whole, the contract does not establish direct proportionality between participation charges and actual costs. The requirement is merely that charges will be measured in relation to actual costs, a less precise standard.

Thus, we find no basis in the contract or the policy of the Water Board that mandates that the participation charges, set forth in precise percentages, must be reduced so that Southgate shares in the economics of scale resulting from the oversized construction.

Further, to the extent that any contract terms are ambiguous, and we perceive none, we see no reason not to accord the usual deference given to the trial court's resolution of factual issues upon disputed evidence of intent. Accordingly, the judgment of the trial court in this regard is upheld. *Page v. Clark,* 197 Colo. 306, 592 P.2d 792 (1979).

B.

Highlands Reservoir Tap Assessment

■ Southgate asserts that Denver's method of calculating the tap assessment for storage at the Highlands Reservoir Basin No. 3 went beyond the contract and

resulted in charges in excess of those contractually allowed. According to Southgate, the only question under the contract is whether or not the charge is in relation to actual construction costs of the reservoir in 1974. We reject this contention.

We agree with the trial court that Southgate had knowledge of, and gave approval to, the method employed in assessing these charges before entering into the contract and that, thus, it became bound thereby when the proposed facilities were put in service.

■ We do not believe the contract can be read to mandate acceptance of historical costs as the baseline for the tap assessment. Denver City Charter § C4.26, in effect, authorized tap charges based upon consideration of a variety of factors. Historical costs, past operating and financial experience, changes in return requirements for the future, and other variables such as material costs and wage levels would be relevant in the Board's determination of the "additional amount" to be charged. Thus, in view of the Charter provision, it cannot be assumed that "actual cost" under the contract is necessarily to be measured by looking only to the original construction cost and disregarding other considerations.

■ As a matter of contract interpretation, in determining a breach thereof, the appropriateness of Denver's charges cannot be considered by this court, and we are obliged to enforce the contract as written. *Thurmon v. Skipton,* 157 Colo. 423, 403 P.2d 211 (1965). Thus, the trial court's decision to reject Southgate's breach of contract claim upon this issue was legally sound and will not be disturbed on appeal.

## III.

Southgate further contends the trial court erred in determining that the Participation Agreement authorized Denver to charge for certain miscellaneous items in dispute. We disagree with this contention except as to the item of flood damage.

### A.

#### Indirect Costs

■ Parol evidence is admissible to explain or clarify the meaning of a contract or the effect of its provisions when an ambiguity has been determined to exist in its terms. *McNichols v. City & County of Denver,* 120 Colo. 380, 209 P.2d 910 (1949); *Montoya v. Cherry Creek Dodge, Inc.,* 708 P.2d 491 (Colo.App.1985). In first determining whether an ambiguity exists, however, the contract must be construed in conformity with the plain and generally understood definition of terms employed. *Hott v. Tillotson–Lewis Construction Co.,* 682 P.2d 1220 (Colo.App.1983).

■ Here, with the exception of the charges for conduits, the agreement set forth that Southgate would pay a portion of the "actual costs" of construction, not otherwise defined except in general terms. The record disclosed that, under this category, Denver allocated to Southgate some of the general and administrative overhead including warehouse, maintenance, and tool expense, employee benefits, and the like. The record also discloses that this was the customary practice of Denver in similar contracts. Further, the manager of Southgate admitted that he was familiar with this practice and that this type of allocation was customary in the industry.

In our view, Denver presented ample evidence to support its contention that the term "actual costs" was ambiguous but was intended to include consideration of the overhead factors listed. Thus, the trial court's determination that such costs were properly charged to the contract will not be disturbed on appeal. *See Asphalt Paving Co. v. United States Fidelity & Guaranty Co.,* 671 P.2d 1013 (Colo.App.1983).

### B.

#### Road Paving

■ During the process of construction, roads in the vicinity of Highlands Pump Station were paved and the expense allocated to Southgate.

The record discloses that Southgate did not object when, before the road paving was done, plans therefor were shown to it, notwithstanding its right to do so under paragraph 5 of the Participation Agreement. Additionally, there was evidence that such paving was necessary to avoid destruction of the existing access because of the construction hauling.

The trial court, as its opinion indicates, concluded that it was an appropriate engineering decision to pave the roads for the purpose of obtaining access to the construction by heavy equipment and, accordingly, that the paving was appropriately billable under the Participation Agreement. As we view it, the evidence supports this conclusion, and that, the judgment of the trial court on this issue will be upheld. *Page v. Clark, supra.*

### C.

### Flood Damage Refund

■ During the construction of one of the conduits, flood damage resulted because one of Denver's employees selected the wrong size clamp. As a result, Southgate was required to share in the repair expense but was not fully reimbursed from insurance proceeds received by Denver.

In our view, Southgate was entitled to recover the amount it paid for Denver's improper work. *See Hi–Valley Constructors, Inc. v. Heyser,* 163 Colo. 1, 428 P.2d 354 (1967). The repairs cannot be considered a legitimate cost of construction that Southgate's agreed to pay in the Participation Agreement. Therefore, the judgment of the trial court must be modified to allow for full reimbursement.

### IV.

■ Southgate also contends the trial court erred in determining that it lacked jurisdiction to review the reasonableness of Denver's participation charges. We disagree with this contention.

Municipal corporations that operate public water utilities are exempt from regulation by the Colorado Public Utilities Com-

mission (PUC). Section 31–35–402(1)(f), C.R.S. (1986 Repl.Vol. 12B); *Board of County Commissioners v. Denver Board of Water Commissioners,* 718 P.2d 235 (Colo.1986) (*Tri–Counties* ).

Section 31–35–402(1)(f) empowers municipalities:

> To prescribe, revise, and collect ... from any consumer or any owner ... of any real property connected therewith or receiving service therefrom, rates, fees, tolls, and charges or any combination thereof for the services furnished by, or the direct or indirect connection with, or the use of ... such water facilities ... including, without limiting the generality of the foregoing, minimum charges, charges for the availability of service, tap fees, disconnection fees, reconnection fees ... *without any modification, supervision, or regulation of any such rates, fees, tolls, or charges by any board, agency, bureau, commission, or official other than the governing body collecting them.* (emphasis supplied)

This statute plainly exempts the Denver Water Board from PUC control in connection with the provision of water service to areas outside the city limits. However, it is less clear as to whether the Board is authorized to enter into contracts with communities or water districts outside Denver to provide for the supply of water if enforcement of the contract would result in nonresidents paying unreasonable charges for water services or facilities in connection therewith.

On the one hand, the statute prohibits regulatory interference with extraterritorial water service by municipalities. This, of course, suggests that a municipally-owned utility can enter into any kind of contract, presumably including a contract which sets forth unreasonable charges, because the acceptance by the nonresident customer of water services implies a promise to pay the charges at the specified rate.

On the other hand, the fact that the PUC does not regulate contracts between municipal utilities and its nonresident customers does not per se diminish the power of

courts to review the reasonableness of utility charges if nothing in the language of the statute precludes such intervention.

The proper scope of the *Tri–Counties* holding is critical to the dispute here. In that case, Arapahoe, Adams, and Jefferson counties brought suit against Denver claiming the PUC had jurisdiction over the ratemaking and service functions of the Denver Water Board in connection with its provision of water service to areas outside the city limits. The counties' argument, which the trial court ultimately accepted, was that the extent of Denver's activities as a municipally-owned utility created a situation in which it had achieved the *status* of a "public utility" under the judicial analysis set forth in *City of Englewood v. City & County of Denver*, 123 Colo. 290, 229 P.2d 667 (1951) and *Robinson v. City of Boulder*, 190 Colo. 357, 547 P.2d 228 (1976).

In *Tri–Counties*, however, the supreme court overruled *Englewood* and *Robinson* in that respect, holding that Denver's status as a public utility was founded instead on the definition contained in § 40–1–103(1)(a), C.R.S. (1984 Repl.Vol. 17). The court determined that Denver's activities fit within the statutory definition, but were nonetheless excluded from PUC regulatory control by virtue of § 31–35–402(1)(f). Based on that statute, the court concluded that Denver's governing body had sole control over extraterritorial water service without interference from any regulatory source.

There is no Colorado case after *Tri–Counties* construing § 31–35–402 as it applies to the scope of judicial review or which discusses court "regulation" of municipal utilities. Both sides to this appeal and amicus curiae have cited us to cases applying Colorado common law as it existed prior to *Tri–Counties*, as well as case law from other jurisdictions on the issue.

Courts in other jurisdictions have taken divergent views as to whether nonresidents can seek judicial review over charges imposed on them when, as here, no administrative body has regulatory authority concerning the activities of a municipally-owned utility to furnish services without discrimination and at reasonable rates.

Some jurisdictions have held that if a municipality undertakes to furnish a public service, such as the supplying of water, even though it does so in a proprietary rather than a governmental capacity (by virtue of a contract), it is obliged to service users or customers on a reasonable basis. *See Delony v. Rucker*, 227 Ark. 869, 302 S.W.2d 287 (1957) (reasonableness of utility rates imposed by city subject to judicial review); *Hansen v. City of San Buenaventura*, 42 Cal.3d 1172, 729 P.2d 186, 233 Cal.Rptr. 22 (1986) (duty to provide service at reasonable rates to nonresident customers of municipality that acquires water system of another community); *Austin View Civic Ass'n v. City of Palos Heights*, 85 Ill.App.3d 89, 40 Ill.Dec. 164, 405 N.E.2d 1256 (1980); *City of Texarkana v. Wiggins*, 151 Tex. 100, 246 S.W.2d 622 (1952).

Approval of a judicial mechanism to review municipal rates and charges incident to the extraterritorial sale of utility services is rooted in tenets of utility law requiring that a municipality should be held to the same standard of reasonableness applied in evaluating rates charged by privately-owned utilities. The duty to provide service at fair rates to nonresident users is supported by factors such as the public need for the service, the limited supply of the resource provided, the exclusive right vested in the municipality to furnish service, and the wasteful duplication of extension facilities that would otherwise result. By allowing judicial review, nonresidents are afforded protection against exorbitant rates, while the municipality is permitted to obtain a fair return from the provision of services outside its boundaries.

It is argued that support for this line of authorities is also found in § 40–3–101, C.R.S. (1984 Repl.Vol. 17), which provides:

> All charges made, demanded, or received by any public utility for any rate, fare, product, or commodity furnished or to be furnished, or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge

made, demanded, or received for such rate, fare, product or commodity, or service is prohibited and declared unlawful.

While this is a portion of the Public Utilities Act, it is asserted that it expresses the state policy as to the validity of public utility charges and that it restates the fundamental rule that a public utility, whether publicly or privately owned, may not discriminate in the distribution of services or the establishment of rates and reflects a continuation of basic principles that have governed supervision of utility rates in Colorado for some time. In support of this argument, reference is made to *Seaton Mountain Electric Light, Heat & Power Co. v. Idaho Springs Investment Co.,* 49 Colo. 122, 111 P. 834 (1910).

Thus, it is contended that the clear import of the statute is to establish a standard of reasonableness applicable to every public utility notwithstanding an exemption from regulatory control and to afford to its customers a substantive right to reasonable rates and charges.

However, there is also a substantial line of authority which rejects the concept that extraterritorial users are entitled to judicial review as to the reasonableness of charges. *See City of Phoenix v. Kasun,* 54 Ariz. 470, 97 P.2d 210 (1939); *State of Florida v. City of Melbourne,* 93 So.2d 371 (Fla.1957); *Davisworth v. City of Lexington,* 311 Ky. 606, 224 S.W.2d 649 (1949); *Bleick v. City of Papillion,* 219 Neb. 574, 575, 365 N.W.2d 405 (1985) (statute which requires city to furnish utility service subject to reasonable regulations applies only to residents of the city); *Fairway Manor, Inc. v. Board of Commissioners of Summit County,* 36 Ohio St.3d 85, 521 N.E.2d 818 (1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 776 (1989) (because rates to nonresident were set by contract, reasonableness not a proper subject for judicial review). Under these cases, resort to judicial review may not be had for the purpose of seeking a redetermination of rates or obtaining relief from enforcement of charges fixed by contract.

Precepts enunciated in cases upholding the power of municipalities contractually to establish and regulate their own rates arguably are embodied in and reinforced by § 31–35–402(1)(f) which exempts municipal utilities from any form of regulation. For this reason, Denver urges that the statute renders inoperable the concept of reasonableness in the process of judicial review and asks us to hold that the sale of water by the city to nonresidents has been left as a matter of voluntary contract, free from intervention by the courts.

To support its present contention that judicial review would be inappropriate, Denver relies in part on *City of Colorado Springs v. Kitty Hawk Development Co.,* 154 Colo. 535, 392 P.2d 467 (1964). There, the supreme court held that Colorado Springs had no duty to supply water services outside its boundaries absent a contractual obligation. If, however, it chose to do so, the courts had jurisdiction to review the contract and its breaches, but only in the same manner as any other private contract. Thus, the court was without power to require the city to furnish water to extraterritorial purchasers or to decide the reasonableness of the fee fixed by the contract.

The *Kitty Hawk* rationale presumes that a municipality is not acting in the nature of a public utility with respect to services extended outside municipal boundaries. *Cf. Robinson v. City of Boulder,* 190 Colo. 357, 547 P.2d 228 (1976) (overruled in part in *Tri–Counties, supra.* However, after *Tri–Counties,* the term "public utility" in § 40–1–103(1)(a) of the Public Utilities Act must be construed to include municipally-owned utilities, despite exclusions previously applied in the case law. Consequently, there is no longer a principled basis upon which to say that ratemaking policies of municipal utilities must be adjudicated purely as a matter of private contract or, as Denver contends, that its water facility operation outside the city limits is one purely in a "propriety capacity."

■ Upon considering the two divergent lines of authority and the express language of *Tri–Counties,* we conclude that, because of the provisions of § 31–35–402(1)(f), judicial review of the reasonable-

ness of extraterritorial water service charges imposed by a municipality constitutes a prohibited regulation of that service.

In *Tri–Counties,* 718 P.2d at 246, the court noted that "implicit in [*City of Englewood v. City and County of Denver, supra*] and explicit in [*Robinson v. City of Boulder, supra*]" is the belief that the *courts* could declare an entity to be a public utility under a common law test and "order a *court-supervised regulatory remedy.*" In overruling these two cases in those respects, the court then stressed that under § 31–35–402(1)(f), not only was PUC regulation precluded, but that the municipality retained *sole control* over its extraterritorial water service "without interference from any source."

While we recognize that judicial review of the claimed unreasonableness of water utility charges occurs subsequent to their imposition, we are unable to discern how this in any respect detracts from their regulatory nature, or does not constitute, in the words of the supreme court, a "court-supervised regulatory remedy." Moreover, after examining § 31–35–402(1)(f), we note that the statutory prohibition against interference relates to "modification" of existing charges as well.

Accordingly, we agree with the trial court in the dismissal of this claim.

Except for that portion of the judgment relating to the flood repair damage, the judgment is affirmed. That portion of the judgment relating to the reimbursement due Southgate for the flood repair is vacated, and the cause is remanded for further proceedings on this claim consistent with this opinion.

SMITH and CRISWELL, JJ., concur.