CITY AND COUNTY OF DENVER, acting By and Through its BOARD OF WATER COMMISSIONERS, Petitioner,

v.

BOARD OF COUNTY COMMISSIONERS OF GRAND COUNTY, the Northwest Colorado Council of Governments, and Board of County Commissioners of the County of Eagle, Respondents.

No. 88SC358.

Supreme Court of Colorado,
En Banc.

Nov. 13, 1989.

City and County of Denver, Wayne D. Williams, Michael L. Walker, Casey S. Funk and Henry C. Teigen, Denver, for petitioner.

Holme Roberts & Owen, Henry W. Ipsen, Denver, James R. Fritze, Eagle County Atty., Eagle, Anthony J. DiCola, Grand County Atty., Hot Sulphur Springs, and Popham, Haik, Schnobrich & Kaufman, Ltd., Barbara J.B. Green, Counsel, Denver, for respondents.

Anderson, Johnson & Gianunzio, Mark T. Pifher, Colorado Springs, for amici curiae Cities of Aurora and Colorado Springs.

Justice VOLLACK delivered the Opinion of the Court.

Petitioner, the City and County of Denver (Denver), acting by and through its Board of Water Commissioners (the Denver Water Board), petitioned for certiorari review of the court of appeals decision in *City and County of Denver v. Board of County Commissioners*, 760 P.2d 656 (Colo.App.1988). The court of appeals held that sections 24–65–101 to 24–65.1–502, 10B C.R.S. (1988) (the Land Use Act or the Act), do not manifest an unlawful delegation of legislative power.

I.

In 1974 the Colorado legislature adopted the Land Use Act in response to the "rapid growth and development of the state and the resulting demands on its land resources." § 24–65–102(1). The Act is "Colorado's first comprehensive land use law," Bermingham, *1974 Land Use Legislation in Colorado*, 51 Den.L.J. 467, 468 (1974), and is designed to protect Colorado's land resources and allocate those resources among competing uses. *See* § 24–65–102(1). To accomplish these goals the Act identifies a list of activities of state interest and allows local governments to address local land use concerns by regulating activities which are represented on the list. The Act thus allows both state and local governments to supervise land use which may have an impact on the people of Colorado beyond the immediate scope of the land use project. *Colorado Land Use Comm'n v. Board of County Comm'rs*, 199 Colo. 7, 12, 604 P.2d 32, 34 (1979).

Article 65.1 of the Land Use Act, §§ 24–65.1–101 to 24–65.1–502, encourages local governments to designate areas and activities of state interest, and promulgate guidelines for the administration of those areas and activities. *See* § 24–65.1–101(2)(b). Section 24–65.1–203 identifies activities which local governments may declare to be of state interest. Section 24–65.1–203(1) specifically provides that,

[s]ubject to the procedures set forth in part 4 of this article, a local government may designate certain activities of state interest from among the following:

(a) Site selection and construction of major new domestic water and sewage treatment systems;

. . . .

(h) Efficient utilization of municipal and industrial water projects. . . .

Section 24–65.1–204 establishes criteria for the administration of activities of state interest. Subsection 24–65.1–204(1) establishes criteria for the construction of new domestic water and sewage treatment systems, and major extensions of domestic water and sewage treatment systems. Subsection 24–65.1–204(8) establishes criteria for the efficient utilization of municipal and industrial water projects.

In 1978 the Board of County Commissioners of Grand County (the Grand County Board) designated site selection and construction of major new domestic water and sewage treatment systems to be an activity of state interest. Grand County Admin. Regs. for Areas and Activities Designated as Matters of State Interest, Resolution No. 1978–5–4, book 245, p. 4. The Grand County Board also adopted regulations governing activities it declares to be of state interest (the Grand County regulations or the regulations). *Id.*, Resolution No. 1978–5–4, book 245, p. 4. The regulations require those who wish to construct major new domestic water systems in Grand County to apply to the Grand County Board for a permit. *Id.*, § 1–301(1), book 245, p. 14; *id.*, § 3–302(1), book 245, p. 25.

In 1980 the Eagle County Board of County Commissioners (the Eagle County Board) designated site selection and con-

struction of major new domestic water and sewage treatment plants to be an activity of state interest. Eagle County Admin. Reg. 6.03.10. The Eagle County Board also designated efficient utilization of municipal and industrial water projects to be an activity of state interest. Eagle Co. Admin.Reg. 6.05.07. The Eagle County Board adopted regulations governing activities the Eagle County Board declares to be of state interest. Eagle Co. Admin.Regs. 6.03.07 to –.17, and 6.05.01 to –.17 (the Eagle County regulations or the regulations). The regulations provide that "[n]o person may locate a major new domestic water or sewage treatment system wholly or partially within the unincorporated territory of [Eagle] County without first obtaining a permit pursuant to these Regulations." Eagle County Admin.Reg. 6.03.-11(1). The regulations also provide that "[n]o local authority shall issue a building permit for purposes of selecting a site for constructing a major new domestic water or sewage treatment plant without the applicant first having obtained a permit pursuant to these Regulations." Eagle County Admin.Reg. 6.03.11(2). The regulations establish the Eagle County Board as the Eagle County permit authority to receive applications for conduct of an activity of state interest. Eagle County Admin.Reg. 6.02.04(1).

Denver brought two separate actions against Eagle and Grand Counties to obtain declaratory judgments that it need not obtain permits from the Eagle or Grand County Boards to construct or operate water collection and diversion facilities in Eagle and Grand Counties. The Grand County case began on November 23, 1979, when the Northern Colorado Water Conservancy District and its municipal subdistrict (the Northern Colorado Water District) and Denver, acting by and through the Denver Water Board, filed a complaint against the Grand County Board. The complaint al-

leged that Denver, acting through the Denver Water Board, was in the process of extending its raw water collection facilities in Grand County in order to take advantage of water rights it held in Grand County. The complaint also alleged that the Northern Colorado Water Conservancy District annually diverted water from Grand County to northeastern Colorado, and that its municipal subdistrict planned to construct and operate water diversion facilities in Grand County. The complaint sought a declaratory judgment invalidating the Grand County Board's regulations requiring Denver to apply to the Grand County Board for permits to construct and operate the water diversion facilities. Defendants, the Grand County Board, and plaintiffs, Denver and the Northern Colorado Water District, moved for summary judgment. The district court entered a summary judgment order in favor of the Grand County Board.

The Eagle County case began on October 26, 1981, when Denver, acting by and through the Denver Water Board, filed a complaint against the Eagle County Board. The complaint alleged that the Denver Water Board was in the process of developing water rights in Eagle County to provide a larger and more dependable water works system for Denver. The complaint sought a declaratory judgment invalidating the Eagle County regulations requiring the Denver Water Board to apply to the Eagle County Board for a permit to extend its water works operations in Eagle County. The complaint also sought a declaratory judgment that the Colorado Land Use Commission's [1] approval of Eagle County's regulations was void. The district court entered summary judgment in favor of the Eagle County Board.

Denver, acting through the Denver Water Board, appealed the summary judgments entered against it in both the Grand

---

**1.** The Colorado Land Use Commission was established by § 24–65–103 of the Land Use Act. Section 24–65–104 directs the Land Use Commission to develop a land use planning program. Section 24–65.1–406(1) directs the Land Use Commission to review local government orders designating matters of state interest and

adopting guidelines for the administration of such matters, and accept the designations and guidelines or recommend modifications thereof. Local governments are not required to accept recommendations of the Land Use Commission. § 24–65.1–406(3)(b).

County and Eagle County cases. Denver appealed the Grand County case to this court and we ordered the case transferred to the court of appeals pursuant to section 13–4–110(2), 6A C.R.S. (1987). *City and County of Denver*, 760 P.2d at 658. Denver appealed the Eagle County case to the court of appeals. The court of appeals consolidated the two cases and affirmed the two district court judgments. *Id.* at 664.

## II.

■ Denver contends that the Land Use Act delegates legislative authority to local governments in violation of article V, section 1, of the Colorado Constitution. We hold that the Act satisfies the constitutional standards which measure legislative delegations of authority.

The legislative power of the state is vested in the General Assembly "consisting of a senate and house of representatives, both to be elected by the people." Colo. Const. art. V, § 1. "The nondelegation doctrine, which has its source in the constitutional separation of powers, prohibits the General Assembly from delegating its legislative power to some other agency or person." *People v. Lowrie*, 761 P.2d 778, 781 (Colo. 1988). We clarified the nondelegation doctrine in *Cottrell v. City and County of Denver*, 636 P.2d 703, 708–710 (Colo.1981). In *Cottrell* we recognized the inadequacy of "[t]he traditional statement of the nondelegation doctrine" that "the legislature may delegate power to an administrative agency only if 'the legislature has provided sufficient standards to guide the agency's exercise of that power.'" *Id.* at 708 (quoting *Elizondo v. Department of Revenue*, 194 Colo. 113, 570 P.2d 518 (1977)). We noted that "the proper focus should be upon the totality of protection provided by standards and procedural safeguards at both the statutory and administrative levels." *Cottrell*, 636 P.2d at 709. In *Cottrell*, 636 P.2d at 709, we stated that the test for nondelegation is

> whether there are sufficient statutory standards and safeguards and administrative standards and safeguards, in com-

bination, to protect against unnecessary and uncontrolled exercises of discretionary power. The guiding consideration is whether these constraints are sufficient to ensure that administrative action will be rational and consistent in the first instance and that subsequent judicial review of that action is available and will be effective.

We concluded in *Cottrell*, 636 P.2d at 709–710, that "the appropriate analysis is to determine first whether sufficient statutory safeguards exist to fulfill these functions.... [I]f those standards and safeguards are inadequate, it must be determined whether additional administrative standards and safeguards accomplish the necessary protection from arbitrary action."

In the course of upholding statutory delegations of power to agencies, we have noted that it would be impossible for the legislature to prescribe every agency action without "destroying the flexibility necessary to effectuate obvious legislative goals in dealing with complex economic and social problems." *Lowrie*, 761 P.2d at 781. For example, in *Mountain View Electric Association v. Public Utilities Commission*, 686 P.2d 1336, 1341 (Colo.1984), we held that the authority of the Public Utilities Commission (PUC) to regulate public utilities in the interest of public safety authorized it to order an electric association to relocate or bury an electric transmission line because the line posed a safety threat to a nearby airport. We held in *Mountain View*, 686 P.2d at 1340, that a statutory provision which gave the PUC the power to "make general or special orders, rules or regulations or otherwise to require each public utility to maintain and operate its ... electrical wires ... in such manner as to promote and safeguard the health and safety of ... the public" authorized the PUC to order the electric association to move or bury the power line.

In *Beaver Meadows v. Board of County Commissioners*, 709 P.2d 928, 935 (Colo. 1985), we held that although Colorado's master plan, zoning, subdivision and Planned Unit Development (PUD) enabling

statutes constituted a broad delegation of authority encompassing the subject of road planning and development, they empowered Larimer County to condition approval of PUD applications on the developer's improvement of public roads providing access to the PUD. None of the statutory provisions at issue in *Beaver Meadows*, 709 P.2d at 935, specifically and expressly authorized a county to condition approval of a PUD application upon the developer's improvement of the public roads providing access to the PUD. We concluded, however, that the state enabling statutes were "fully adequate to authorize a county to adopt regulations for PUD approval that would require a developer to provide assurance of adequate access roads to serve the proposed development." *Id.* at 936.[2]

In *People v. Lowrie*, 761 P.2d at 783, we held that the Colorado Liquor Code authorized the Executive Director of the Department of Revenue (the Director) to adopt regulations prohibiting specific suggestive acts in the live entertainment provided in licensed taverns. The enabling statutes at issue in *Lowrie* were more general than the Director's regulations. The statutes authorized the Director to promulgate rules for the proper regulation of the sale of alcoholic beverages on such subjects as "practices unduly designed to increase the consumption of alcoholic beverages" and "standards of cleanliness, orderliness and decency." *Id.*

Like the statutes involved in *Mountain View, Beaver Meadows,* and *Lowrie*, the Land Use Act contains sufficient standards and safeguards to protect against unnecessary and uncontrolled exercises of discretionary power.

### A. Local Government Designations of Activities of State Interest

■ Denver argues that the Land Use Act unconstitutionally delegates legislative

power to local governments because subsection 24-65.1-203(1) provides that "a local government *may* designate certain activities of state interest from among the following:...." (Emphasis added). Denver argues that subsection 24-65.1-203(1) creates a standardless delegation of power because local governments are not required to declare any of the activities listed in that section to be of state interest.

Subsection 24-65.1-203(1) limits local governments to declarations that the activities listed within that subsection are activities of state interest. Although local governments are not compelled by the Act to declare any particular activity to be of state interest, *Colorado Land Use Commission,* 199 Colo. at 12, 604 P.2d at 35, they must make such a declaration in order to exercise power under the Act. By allowing each local government in Colorado to decide which areas and activities it will declare to be of state interest, the Act permits local governments to regulate those areas and activities which directly concern them, and does not force them to issue declarations of state interest about areas and activities which, in their judgment, they need not regulate.

Part 4 of the Act, sections 24-65.1-401 to -407, establishes the procedures which local governments must follow in order to declare an activity to be of state interest. Subsection 24-65.1-401(1) requires local governments to hold hearings before designating matters of state interest. When a local government designates a matter of state interest, it must consider "[t]he intensity of current and foreseeable development pressures," § 24-65.1-401(1)(a), and "[a]pplicable guidelines for designation issued by the Colorado Land Use Commission after recommendation from other state agencies, if appropriate." § 24-65.1-401(1)(b). Subsection 24-65.1-401(2) specifies that

---

2. In *Beaver Meadows*, 709 P.2d at 936, we held that although the statutes at issue were sufficient to authorize Larimer County to adopt regulations for PUD approval requiring developers to provide assurance of adequate access roads to serve the proposed development, the county regulations lacked the detail necessary to support the specific condition imposed by the Larimer County Board of County Commissioners. Thus we held that the statutes authorized the regulations implementing the access requirement, but that those regulations were not sufficiently specific to authorize the Board's action.

[a] designation shall: (a) Specify the boundaries of the proposed area; and, (b) State reasons why the particular area or activity is of state interest, the dangers that would result from uncontrolled development of any such area or uncontrolled conduct of such activity, and the advantages of development of such area or conduct of such activity in a coordinated manner.

Section 24–65.1–404 governs public hearings held by local governments for the purpose of designating areas or activities of state interest and adopting guidelines for the administration of such areas or activities. Subsection 24–65.1–404(2)(a) requires the local government to publish notice of hearings in county newspapers between thirty and sixty days before the date of the hearing. Local governments are also required to send written notice to the Colorado Land Use Commission, *id.*, and anyone requesting such notice. § 24–65.1–404(2)(b).

Section 24–65.1–407 establishes a procedure whereby the Colorado Land Use Commission can formally request a local government to take action with regard to matters the Land Use Commission considers to be of state interest. When the Land Use Commission makes such a request the local government is required to hold a hearing and make a determination that the matter is or is not of state interest. § 24–65.1–407(1)(a). Local government orders issued pursuant to this section which fail to designate a matter to be of state interest are reviewable in the district court, § 24–65.1–407(1)(c). The district court's review cannot take the form of a trial on the merits of the local government's decision to designate, or not designate, a matter of state interest. Judicial review under section 24–65.1–407 is limited to questions of illegality or impropriety on the part of the local government.[3] *Colorado Land Use Comm'n*, 199 Colo. at 13, 604 P.2d at 36. Thus section 24–65.1–407 provides a means by which the Land Use Commission can

check local government abuse of discretion in designating, or failing to designate, certain matters of state interest.

The Act sufficiently directs and limits the authority of local governments to make declarations of activities of state interest. We therefore reject Denver's argument that section 24–65.1–203(1) confers legislative power on local governments.

### B. Standards for Local Government Regulations

The Act's guidelines for local government administration of activities of state interest provide additional protections against uncontrolled exercise of discretionary power by local governments. Subsection 24–65.1–402(1) requires the content of local government guidelines for the administration of designated matters of state interest to "be such as to facilitate administration of matters of state interest consistent with sections 24–65.1–202 and 24–65.1–204." The Grand County Board designated site selection and construction of major new domestic water and sewage treatment systems to be an activity of state interest pursuant to subsection 24–65.1–203(1)(a). Grand County Admin.Regs. for Areas and Activities Designated as Matters of State Interest, Resolution No. 1978–5–4, book 245, p. 4. Guidelines for the administration of this activity of state interest are contained in subsections 24–65.1–204(1)(a) and (b). Subsection 24–65.1–204(1)(a) provides that "[n]ew domestic water and sewage treatment systems shall be constructed in areas which result in the proper utilization of existing treatment plants and the orderly development of domestic water and sewage treatment systems of adjacent communities." Subsection 24–65.1–204(1)(b) states that "[m]ajor extensions of domestic water and sewage treatment systems shall be permitted in those areas in which the anticipated growth and development that may occur as a result of such extension can be accommodated within the financial and

---

**3.** In *Colorado Land Use Commission,* 199 Colo. at 13–14, 604 P.2d at 36, we held that during such review proceedings "any relevant evidence may be introduced to attempt to prove illegality such as fraud, sham, bribery, failure to comply with statutory requirements, or abuse of legislative discretion." (Footnote omitted).

environmental capacity of the area to sustain such growth and development."

The Eagle County Board also designated site selection and construction of major new water and sewage treatment facilities to be an activity of state interest pursuant to subsection 24–65.1–203(1)(a). Eagle County Admin.Reg. 6.03.10. In addition, the Eagle County Board designated the efficient utilization of municipal and industrial water projects to be an activity of state interest pursuant to subsection 24–65.1–203(1)(h). Eagle County Admin.Reg. 6.05.01. Guidelines for the administration of the latter activity are contained in subsection 24–65.1–204(8), which states that

[m]unicipal and industrial water projects shall emphasize the most efficient use of water, including, to the extent permissible under existing law, the recycling and reuse of water. Urban development, population densities, and site layout and design of storm water and sanitation systems shall be accomplished in a manner that will prevent the pollution of acquifer recharge areas.

The Act therefore requires local governments to adopt regulations administering activities of state interest which are consistent with subsections 24–65.1–204(1)(a) and (b), and 24–65.1–204(8).

■ Denver argues that section 24–65.1–402(3) unconstitutionally delegates legislative power to local governments. Section 24–65.1–402(3) states that "[n]o provision in this article shall be construed as prohibiting a local government from adopting guidelines or regulations containing requirements which are more stringent than the requirements of the criteria listed in sections 24–65.1–202 and 24–65.1–204." This provision allows local governments to adopt regulations which are more stringent than the guidelines contained in the plain language of subsections 24–65.1–204(1)(a) and (b), and 24–65.1–204(8). This is an understandable provision since the guidelines contained in those subsections are phrased in general terms to provide local governments with the flexibility to achieve the objectives in the guidelines in an efficient manner. Even though local govern-

ments may adopt more stringent regulations, the regulations must still serve the objectives contained in the guidelines in subsections 24–65.1–204(1)(a) and (b), and 24–65.1–204(8). Furthermore, the grant of power contained in subsection 24–65.1–402(3) is sufficiently limited by the other provisions of the Act which prevent uncontrolled exercises of discretionary power by local governments. We therefore reject Denver's contention that section 24–65.1–402(3) unconstitutionally delegates legislative power to local governments.

We conclude that the provisions of the Act governing local government designation and administration of activities of state interest do not unconstitutionally delegate legislative authority to local governments.

### C. Local Government Response to Permit Applications

■ The permit application procedures imposed on local governments by the Act further protect against the uncontrolled exercise of discretionary power by local governments. Subsection 24–65.1–501(1)(a) requires any person desiring to conduct an activity of state interest to file an application for a permit with the local government in the area where the activity is to take place. Subsection 24–65.1–501(2)(a) contains notice requirements for local governments which are similar to the notice requirements in subsections 24–65.1–404(2)(a) and (b). Subsection 24–65.1–501(4) provides that, in order for the local government to approve a permit application, the proposed activity of state interest must comply with the local government's regulations and guidelines for conduct of that activity. Subsection 24–65.1–501(1)(b) requires the local government to preserve a record of the hearing and state in writing its findings and conclusions and the reason for its decision.

Subsection 24–65.1–108(1) requires state agencies and commissions to respond to applications for development permits in writing, within a reasonable period of time not to exceed sixty days. The state agency or commission must in its response grant or deny the permit, or specify all reason-

able additional information necessary for the agency or commission to respond. Subsection 24–65.1–108(2) specifies that

[w]henever a state agency or commission denies a permit, the denial must specify:

(a) The regulations, guidelines, and criteria or standards used in evaluating the application;

(b) The reasons for denial and the regulations, guidelines, and criteria or standards the application fails to satisfy; and

(c) The action that the applicant would have to take to satisfy the state agency's or commission's permit requirements.

Subsection 24–65.1–108(3) provides that when developers submit permit applications which describe "the proposed nature, uses, and activities in conceptual terms," the agency or commission may approve the application in conceptual terms, but "[s]uch conceptual approval shall be made subject to the applicant filing and completing all prerequisite detailed additional information in accordance with the usual filing requirements of the agency or commission within a reasonable period of time."

Finally, the Act provides for judicial review of local government decisions to deny applications for permits to conduct activities of state interest. Section 24–65.1–502 states that "[t]he denial of a permit by a local government agency shall be subject to judicial review in the district court for the judicial district in which the major development or activity is to occur."

Section 24–65.1–501 requires local governments to consider permit applications after holding a recorded hearing. Sections 24–65.1–108 and 24–65.1–501 require local governments to identify their reasons for denying particular permit applications. Section 24–65.1–502 provides for judicial review of local government decisions to deny permit applications. The procedural standards established by these sections, and the opportunity they create for judicial review, protect developers from uncontrolled exercises of discretionary power by local governments.

"A delegation of authority is not invalid simply because its terms are broad and general." *Beaver Meadows,* 709 P.2d at

936. As we stated in *Lowrie,* 761 P.2d at 781, "it will often be impracticable for the General Assembly to fix rigid standards to guide agency action, particularly in situations involving the exercise of the police power, without destroying the flexibility necessary to effectuate obvious legislative goals in dealing with complex economic and social problems." The provisions of the Land Use Act which establish standards and procedures for local government designations and administration of activities of state interest provide a sufficient measure of protection against the uncontrolled exercise of discretionary power by local governments. The permit application procedures imposed on local governments by the Act ensure effective judicial review of local government designations and administration of activities of state interest. The Act allows local governments to address complex land use issues encompassing a range of environmental and developmental problems. The Act allows each local government which regulates designated matters of state interest to address in its regulations local land use concerns. Thus the Act allows local governments to address individual land use concerns, yet it provides sufficient standards and protections, including judicial review, to ensure that such local regulation will not be arbitrary or uncontrolled. The Act allows local governments to regulate efficiently without delegating legislative authority to local governments in violation of article V, section 1, of the Colorado Constitution.

### III.

██ Denver contends that the Land Use Act violates article XX, sections 1 and 6, of the Colorado Constitution by impermissibly infringing upon the exercise of Denver's home rule powers. We conclude that the Land Use Act does not infringe upon the exercise of Denver's home rule powers in violation of article XX, sections 1 and 6, of the Colorado Constitution.

Article XX, section 1, of the Colorado Constitution establishes "the City and County of Denver," and identifies it as a

home rule city. Article XX, section 1, gives Denver

> the power, within or without its territorial limits, to construct, condemn and purchase, purchase, acquire, lease, add to, maintain, conduct, and operate water-works, light plants, power plants, transportation systems, heating plants, and any other public utilities or works or ways local in use and extent, in whole or in part, and everything required therefore [sic], for the use of said city and county and the inhabitants thereof, and any such systems, plants, or works or ways, or any contracts in relation or connection with either, that may exist and which said city and county may desire to purchase, in whole or in part, the same or any part thereof may be purchased by said city and county which may enforce such purchase by proceedings at law as in taking land for public use by right of eminent domain, and shall have the power to issue bonds upon the vote of the taxpaying electors, at any special or general election, in any amount necessary to carry out any of said powers or purposes, as may by the charter be provided.

Colorado Const., art. XX, § 1. Article XX, section 6, of the Colorado Constitution gives Denver the power to make and amend a charter to govern Denver's local and municipal matters. Denver contends that, by authorizing regulations which limit its authority to construct and operate a water works system in Eagle and Grand Counties, the Land Use Act violates article XX, sections 1 and 6, of the Colorado Constitution.

■ The Land Use Act gives Grand County and Eagle County the power to regulate, but not to prohibit, Denver's operation of extraterritorial waterworks projects. *See Town of Glendale v. City and County of Denver*, 137 Colo. 188, 194–95, 322 P.2d 1053, 1057 (1958); *cf. City of Thornton v. Farmer's Reservoir and Irrigation Co.*, 194 Colo. 526, 533, 575 P.2d 382, 388 (1978) (Water Rights Condemnation Act violated article XX because it gave municipal commissions power to prevent acts of condemnation by home rule cities). The powers granted to Denver in article XX, section 1, do not prevent other local governments from regulating the activities identified in that section.

■ Since Denver's water projects in Eagle and Grand Counties are not insulated from the Eagle and Grand County regulations by article XX, sections 1 and 6, whether Denver must submit to the regulations depends upon whether, with respect to Denver, the activities at issue are matters of state, local, or mixed state and local concern. In matters of local and municipal concern, the enactments of a home rule city supersede enactments of the General Assembly. Colorado Const. art. XX, § 6; *City and County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 740 (Colo.1985). In matters of statewide concern, enactments of the General Assembly take precedence over the enactments of home rule cities in the absence of a specific constitutional grant of power to the home rule city. *City and County of Denver*, 696 P.2d at 740. In matters of concern to both the state and home rule cities, the enactments of both levels of government may coexist but, to the extent they conflict, the state legislation supersedes the enactments of the home rule city. *Id.* at 741. We noted in *City and County of Denver*, 696 P.2d at 741, that there is no litmus test "to determine whether any particular issue is a matter of local, statewide or mixed concern." Rather than employ a rigid legal standard we have made such determinations on a case-by-case basis. *Id.; Denver & Rio Grande W. Ry. Co. v. City and County of Denver*, 673 P.2d 354, 358 (Colo.1983).

"The respective legislative bodies of a municipality and the state are the judges in the first instance of whether a matter is of local or statewide concern." *City and County of Denver*, 696 P.2d at 741. We agree with the legislature's determination, expressed in subsections 24–65.1–203(1)(a) and (h), that the orderly and rational development of major new domestic water systems, and the efficient utilization of municipal and industrial water projects, are matters of statewide concern. These activities are also matters of obvious concern to the

municipalities in which such water projects are built and operated, and to the municipalities served by such water projects. Therefore site selection and construction of major new domestic water systems, and the efficient utilization of municipal and industrial water projects, are activities of mixed state and local concern.

We reached a similar conclusion in *Denver & Rio Grande*, 673 P.2d at 354. In that case we held that Denver exceeded its jurisdiction by initiating proceedings to require three railroads to pay for construction of the West Eighth Avenue Viaduct. *Id.* at 355. We recognized that Denver had a "considerable interest in the construction of railroad-highway crossings within its municipal limits." *Id.* at 358. We also noted, however, that the viaduct would affect people residing outside of Denver, and that the state had an interest in regulating railroad safety at railroad crossings and overpasses. *Id.* at 358–59. We therefore held that the construction of the viaduct was a matter of mixed state and local concern. *Id.* at 360. The same reasoning applies in this case. Denver's construction and operation of water projects outside of its boundaries is a matter of concern to the people of Denver, but those projects are also a matter of concern to the people in counties in which Denver builds and operates the water projects. Furthermore, the Land Use Act makes the thoughtful and coordinated development of such projects a matter of state interest. The activities at issue in the present case are matters of mixed state and local concern.

Because the activities at issue here are of mixed state and local concern, Denver's refusal to submit to the permit application process established in the Act and the Eagle and Grand County regulations is unauthorized to the extent that Denver's rights under its charter to construct a waterworks system within or without its territorial limits conflict with provisions of the Act. *See Denver & Rio Grande*, 673 P.2d at 360. The Eagle County Board and the Grand County Board adopted regulations pursuant to the Land Use Act which require Denver to apply for permits for its water projects. The permit application process is specifically authorized by the Act. § 24–65.1–501(1)(a). Denver brought these actions to obtain declaratory judgments that it need not apply to the Eagle County Board or the Grand County Board for permits to further develop its water projects. The fact that Denver brought these actions demonstrates that its refusal to submit permit applications is inconsistent with the Land Use Act.

We hold that the Land Use Act does not impermissibly infringe on the powers conferred on Denver by article XX of the Colorado Constitution.

## IV.

Denver argues that it should not have to apply to the Eagle or Grand County Boards for permits for its water projects because sections 24–65.1–105 to –107, as well as sections 37–92–501, 15 C.R.S. (1974), 25–8–104, 11 C.R.S. (1982), and 30–28–110(1)(c), 12A C.R.S. (1986), completely exempt Denver's water projects from the Eagle and Grand County regulations. We disagree.

### A. Sections 24–65.1–105 to –107

Denver's first argument is that it should not have to apply to the Eagle or Grand County Boards for permits for its water projects because section 24–65.1–105 provides Denver with a blanket exemption from the regulations adopted by the Eagle and Grand Counties pursuant to the Act.

The relevant portions of section 24–65.1–105 provide that:

(1) With regard to public utilities, nothing in this article shall be construed as enhancing or diminishing the power and authority of municipalities, counties, or the public utilities commission....

(2) Nothing in this article shall be construed as enhancing or diminishing the rights and procedures with respect to the power of a public utility to acquire property and rights-of-way by eminent domain to serve public need in the most economical and expedient manner.

Denver argues that under our decision in *Board of County Commissioners v. Denver Board of Water Commissioners*, 718

P.2d 235, 244 (Colo.1986) (*Tri Counties*), the Denver Water Department is a public utility. Denver argues further that subsections 24–65.1–105(1) and (2) are consistent with our holding in *Tri Counties,* 718 P.2d at 246, that, under section 31–35–402(1)(f), 12 C.R.S. (1977),[4] no board, agency, bureau, commission or official had the authority to regulate municipally owned extraterritorial water services.

The first sentence of subsection 24–65.1–105(1) and the whole of subsection 24–65.1–105(2) are too general to exempt Denver from local government regulations of activities of state interest adopted pursuant to the Act. Subsections 24–65.1–105(1) and (2) merely express the intent of the General Assembly that regulations adopted by counties pursuant to the Land Use Act not interfere with the exercise of power by municipalities, counties or the PUC. Therefore, while subsections 24–65.1–105(1) and (2) may provide the courts with a basis for invalidating particular local government regulations, they do not exempt Denver's water projects from every conceivable regulatory scheme. *See City of Lakewood v. Haase,* 198 Colo. 47, 50, 596 P.2d 392, 393 (1979).

In *Tri Counties,* 718 P.2d at 245, we held that section 31–35–402(1)(f) prevented the PUC and any other board, agency, bureau, commission, or official from regulating the Denver Water Board's extraterritorial water services. Our conclusion in *Tri Counties* that extraterritorial water services of the Denver Water Board were exempt from regulation was based on the language of subsection 31–35–402(1)(f) prohibiting the regulation of "rates, fees, tolls or charges" for such water services. *Id.* We stated that "there seems to be no basis or reason for PUC or other regulation of utility service in the absence of rate regulation." *Id.* Our opinion in *Tri Counties* held that section 31–35–402(1)(f) exempted the Denver Water Board's extraterritorial provision of services from regulation by other municipalities. Our interpretation of section 31–35–402(1)(f) in *Tri Counties* cannot provide Denver with immunity from local government regulations pertaining to the construction and operation of water works facilities. We did not hold in *Tri Counties* that Denver's construction and operation of water projects enjoyed a general immunity from regulation. *See City and County of Denver v. Bergland,* 517 F.Supp. 155, 209 (D.Colo.1981), *rev'd on other grounds,* 695 F.2d 465 (10th Cir.1982).

The blanket exemption Denver asks for under subsections 24–65.1–105(1) and (2) would undermine other provisions of the Act. Subsection 24–65.1–203(1)(f) defines "[s]ite selection and construction of major facilities of a public utility" to be an activity of state interest. Subsection 24–65.1–501(1)(a) states that "[a]ny person desiring to ... conduct an activity of state interest shall file an application for a permit with the local government in which such ... activity is to take place." Subsection 24–65.1–102(6) states that the definition of " '[p]erson' ... includes any political subdivision ... of the state." These sections demonstrate that the legislature intended to require municipalities such as Denver to apply to local governments for development permits. Denver's interpretation of section 24–65.1–105 renders these provisions of the Land Use Act meaningless.

■ Denver's second argument is that it should not have to apply to the Eagle or Grand County Boards for permits for its water projects because section 24–65.1–106 completely exempts Denver from the Eagle and Grand County regulations.

Section 24–65.1–106 provides that:

(1) Nothing in this article shall be construed as:

(a) Enhancing or diminishing the rights of owners of property as provided by the state constitution or the constitution of the United States;

(b) Modifying or amending existing laws or court decrees with respect to the determination and administration of water rights.

We conclude that this section does not grant to Denver a blanket exemption from the Act for projects related to Denver's

---

4. Now § 31–35–402(1)(f), 12B C.R.S. (1986).

established water rights. Denver's reading of the Act ignores Subsections 24–65.1–203(1)(a) and (h), which subject such water projects to regulation. Like section 24–65.1–105, section 24–65.1–106 expresses the legislature's intent that local government regulations not undermine the property rights, constitutional rights, or water rights of those to whom the regulations apply. Therefore, while section 24–65.1–106 may provide courts with a basis for invalidating particular regulations adopted pursuant to the Act, it does not completely exempt local governments from the regulatory schemes of local governments which impact the developer's established water rights. *See City of Lakewood,* 198 Colo. at 50, 596 P.2d at 393.

▮ Denver's third argument is that it should not have to apply to the Eagle or Grand County Boards for permits for its water projects because subsection 24–65.1–107(1)(b) completely exempts Denver's water projects from the Act. Subsection 24–65.1–107(1)(b) states that the Land Use Act does not apply to any activity of state interest which, prior to May 17, 1974, has been approved by the electorate. Denver argues that the word "electorate" in this section refers to the Denver electorate. We conclude that the word "electorate" in section 24–65.1–107 refers to the electorate of the local government authorized by the Land Use Act to regulate the activity.

Denver's reading of this section is inconsistent with other provisions in the Act which give local governments the power to regulate certain activities of other local governments. If subsection 24–65.1–107(1)(b) exempted from the Act every municipal project approved by the municipality's own electorate prior to May 17, 1974, it would prevent the Act from applying to virtually any activity undertaken by a municipality before May 17, 1974. Furthermore, section 24–65.1–107 exempts activities of state interest from local government regulation if, prior to May 17, 1974, the "appropriate local government" has taken certain actions. For example, an activity of state interest is exempted from the Act if, prior to May 17, 1974, "the ... activity is covered by a current building permit

issued by the appropriate local government." § 24–65.1–107(1)(a). Subsection 24–65.1–107(1)(c)(I) exempts from the Act activities of state interest which have been conditionally or finally approved by the appropriate local government for planned unit development. Subsection 24–65.1–107(1)(c)(II) exempts from the Act activities of state interest which have been zoned by the appropriate local government for the use contemplated by such development or activity. Subsection 24–65.1–107(1)(c)(III) exempts from the Act state activities with respect to which a development plan has been conditionally or finally approved by the appropriate governmental authority. We conclude, based on the meaning of these provisions, that "electorate" refers to the electorate of the local government authorized by the Land Use Act to regulate the activity. *See Bergland,* 517 F.Supp. at 210.

### B. Sections 37–92–501 and 25–8–104

Denver argues that it should not have to apply to the Eagle or Grand County Boards for permits for its water projects because sections 37–92–501 and 25–8–104 completely exempt Denver from Eagle County's and Grand County's regulations.

▮ Section 37–92–501 directs the state engineer and the division engineers to regulate state waters, and provides that no other official, board, commission, department, or agency shall exercise the authority delegated to the state engineer and division engineers. Section 37–92–501 does not completely exempt all water projects from local government regulations adopted pursuant to the Act. On its face the Act does not interfere with the authority of the state and the division engineers. Denver has not identified any provision of the Act, or any regulation adopted pursuant to the Act, which intrudes on the authority delegated to the state engineer and division engineers. Were we to conclude that section 37–92–501 exempted Denver's water projects from regulations adopted pursuant to the Act, we would severely undermine the Act and render meaningless subsections 24–65.1–203(1)(a) and (h) (declarations

of activities of state interest), 24–65.1–204(1)(a) and (b), and 24–65.1–204(8) (guidelines for the administration of activities of state interest).

 Section 25–8–104 provides that the Colorado Water Quality Control Act shall not be interpreted to supersede, abrogate or impair rights to divert water and apply water to beneficial uses in accordance with certain provisions of the Colorado Constitution, various compacts entered into by the state, or Colorado court determinations with respect to the determination and administration of water rights. On its face section 25–8–104 does not limit regulations adopted pursuant to the Land Use Act, and Denver has given us no reason to conclude that restrictions on such regulations should be inferred from the language of section 25–8–104.

### C. Subsection 30–28–110(1)(c)

 Finally, Denver argues that it should not have to apply to the Eagle or Grand County Boards for permits for its water projects because its water projects are completely exempt from the Act under subsection 30–28–110(1)(c). Subsection 30–28–110(1)(c) provides that when the authorization or financing of a public way, ground, space, building, structure or utility does not fall within the province of county officials in the county where the facility is to be constructed, the official body responsible for authorizing or financing the facility must submit the proposed project to the county or regional planning commission. The section also states that the commission's disapproval of a project may be overridden by a majority vote of the official body responsible for authorizing or financing the project. Denver appears to argue that the process described in subsection 30–28–110(1)(c) supersedes permit processes established by local government regulations adopted pursuant to the Land Use Act.

"Statutes upon the same subject are to be construed together and reconciled if pos-

sible, and 'particular statutes prevail over general, and later provisions over former.'" *State Dep't of Revenue v. Borquez*, 751 P.2d 639, 643 (Colo.1988) (quoting *Burton v. Denver*, 99 Colo. 207, 211, 61 P.2d 856, 858 (1936)). Subsection 30–28–110(1)(c) and the Land Use Act are not facially inconsistent. The statute and the Act establish separate procedures for the development of municipal projects. Any arguable power granted to Denver in subsection 30–28–110(1)(c) to overrule planning commission disapproval of a project does not give Denver the unrestricted authority to ignore regulations adopted pursuant to the Land Use Act.

### D. Particular Regulations Are Not At Issue

We have only addressed the question whether the statutory provisions upon which Denver relies grant Denver a blanket exemption from regulations adopted pursuant to Act. This case does not present a justiciable controversy involving particular Eagle or Grand County regulations. "Whether a particular plaintiff has standing to invoke the jurisdiction of the courts is a preliminary inquiry designed to ensure that the judicial power is exercised only in the context of a case or controversy." *Colorado Gen. Assembly v. Lamm*, 700 P.2d 508, 515–16 (Colo.1985). Because Denver has not submitted to the permit application process established by the Eagle and Grand County regulations there is no justiciable case or controversy involving particular regulations.

The Land Use Act does not unconstitutionally delegate legislative authority to local governments. Sections 1 and 6 of article XX of the Colorado Constitution do not exempt Denver's water projects from the Eagle and Grand County regulations. Neither sections 24–65.1–105 to 24–65.1–107, 37–92–501, 25–8–104, nor subsection 30–28–110(1)(c) exempts Denver's water projects from the Eagle and Grand County regulations. The decision of the court of appeals is affirmed.[5]

5. Respondents move us to strike the brief of amici curiae Cities of Aurora and Colorado

Springs on the ground that the amici have addressed issues unrelated to the issues on which

ERICKSON, J., specially concurs.

MULLARKEY, J., dissents.

Justice ERICKSON specially concurring:

Although I agree with the result reached by the majority, I write separately to emphasize the narrowness of the issues decided here. The court of appeals did not have jurisdiction to review the constitutional issues in this case. Section 13–4–102(1)(b), 6A C.R.S. (1987). We granted certiorari to consider the constitutional issues addressed by the district courts in Eagle and Grand Counties. By summary judgment, both district courts upheld the constitutionality of the Land Use Act. The court of appeals opinion addresses only issues relating to interpretation of the Land Use Act. *City & County of Denver v. Board of County Comm'rs*, 760 P.2d 656 (Colo.App.1988). We limited review on certiorari to four narrowly defined issues:

1. Does the Colorado Land Use Act, §§ 24–65.1–101 to –502, 10 C.R.S. (1982), violate art. V, § 1, of the Colorado Constitution because the Act constitutes an unconstitutional delegation of law-making authority to the counties?

2. Does the Colorado Land Use Act, §§ 24–65.1–101 to –502, 10 C.R.S. (1982), violate art. XX, §§ 1 and 6, of the Colorado Constitution by impermissibly infringing upon the exercise of Denver's home rule powers?

3. Are Denver's water diversion projects in Eagle and Grand Counties exempt from land use regulation because of §§ 24–65.1–105 to –107, 10 C.R.S. (1982)?

4. Are Denver's water diversion projects in Eagle and Grand Counties exempt from land use regulation because of the Colorado Planning Statute, § 30–28–110(1)(c), 12 A C.R.S. (1986)?

We granted certiorari on the constitutional issues to consider only whether the delegation of legislative power by the General Assembly in the Land Use Act violated article V, section 1, or article XX of the

Colorado Constitution. The reasonableness or validity of the regulations promulgated by Grand County or Eagle County pursuant to the Land Use Act is not before us, since the petitioners did not invoke or pursue the administrative process in either county before bringing these declaratory judgment actions.

The question before us on this facial challenge to the Act, therefore, is whether the petitioners have proven beyond a reasonable doubt that the Land Use Act is unconstitutional under either article V, section 1, or article XX of the Colorado Constitution. *Lloyd A. Fry Roofing Co. v. Department of Health*, 179 Colo. 223, 227, 499 P.2d 1176, 1178 (1972). The petitioners have failed to meet this heavy burden and for that reason I would affirm the district courts. As the majority states, the delegation of legislative authority issue involves matters of both local and statewide interest. Insofar as the projects at issue are a matter of local concern to both Denver and Eagle and Grand Counties, the delegation of legislative authority to a political subdivision of the state such as a county is not prohibited. *Asphalt Paving Co. v. Board of County Comm'rs*, 162 Colo. 254, 261, 425 P.2d 289, 292–93 (1967).

I would also conclude that the petitioners have not proven beyond a reasonable doubt that the statutory standards and procedures, in combination with the administrative standards and safeguards, will not adequately protect against the unnecessary and uncontrolled exercise of discretionary power. *Cottrell v. City & County of Denver*, 636 P.2d 703, 709–10 (Colo.1981).

In addition to being of local concern, however, I also agree that the projects here involve matters of statewide interest. Thus, the Land Use Act does not, on its face, violate Colo. Const. art. XX, which gives Denver as a home rule city certain powers over matters of purely local concern. *City & County of Denver v. Eggert*, 647 P.2d 216, 226–27 (Colo.1982). Accordingly, I specially concur with the majority in affirming the declaratory judgment up-

we granted certiorari. We have not considered or addressed the issues and arguments raised by

the amici which are unrelated to the issues on which we granted certiorari.

holding the constitutionality of the Land Use Act in this case, and the interpretation of the Land Use Act by the court of appeals that we elected to review on certiorari.

Justice MULLARKEY dissenting:

I respectfully dissent from the court's construction of subsection 24–65.1–107(1)(b), 10B C.R.S. (1988), which exempts a "development or activity [which] has been approved by the electorate" as of May 17, 1974 from the operation of the Land Use Act. Although the term "electorate" is not qualified or defined by the Act, the majority construes the electorate to mean "the electorate of the local government authorized by the Land Use Act to regulate the activity." Maj. op. at 765. In this case, the majority's interpretation means that the Denver water diversion projects could qualify for the exemption only if the voters of Grand and Eagle counties had approved the Denver projects prior to May 17, 1974. Clearly that was impossible. Grand and Eagle counties voters could not authorize Denver to undertake the expenditure of its funds for a water project or any other purpose. *See Four–County Metro. Capital Improvement Dist. v. Bd. of County Comm'rs of Adams County*, 149 Colo. 284, 295, 369 P.2d 67, 72 (1962). Only the Denver electorate could and did authorize these projects by approving the bond issue to fund these projects.

To limit the term "electorate" as the majority has done makes the exemption meaningless. The only project in Grand or Eagle county which would qualify for the exemption would be a project which the voters of that county had approved. Surely if the Grand or Eagle county electorate had authorized its own project prior to 1974, the county would not then use its powers under this Act to prevent the project from going forward. No exemption would be needed.

In construing statutes we first look to their plain and ordinary meaning. *Parrish v. Lamm*, 758 P.2d 1356 (Colo.1988); *People v. District Court*, 713 P.2d 918, 921 (Colo.1986). It is, thus, significant that the term "electorate" in subsection (1)(b) is used alone and it is the only subsection where the words "appropriate local government" or "appropriate government authority" are omitted. The majority asserts that since the specific wording of section 24–65.-1–107(1) is replete with references to "local government," the entire focus of the statutory exemption is on projects already approved by the "appropriate local government." Accordingly, the majority claims that it is consistent with the statutory context to interpret the term "electorate" as referring to the local electorate.

I find this argument of statutory construction unpersuasive. Courts are generally hesitant to insert words and clauses into statutes in order to effectuate the legislative intent or statutory meaning. "It is always a dangerous business to fill in the text of a statute from its purposes, and ... it is utterly unwarranted unless the omission from, or corruption of, the text is plain." 2A N. Singer, *Sutherland Statutory Construction*, § 47.38 (4th ed. 1984). Furthermore, words should not be inserted in a statute "where the court simply would think it wise to do so," or "where the omission is not plainly indicated," or "where words are purposely omitted." *Id.* Therefore, I think the majority has overstepped its bounds in inserting the term "local government" where it is likely that such language was purposefully omitted and where the insertion is not clearly necessary.

The legislative history of this Act shows that the legislature did not take the narrow position which the majority adopts. Subsection 24–65.1–107(1)(c)(III), for example, was amended in the Senate committee to expressly exempt projects approved by entities such as the Regional Transportation District and the Metropolitan Water and Sanitation District. Transcript of the April 11, 1974 hearing of the Senate State Affairs Committee on H.B. 1041. Neither of these entities is a "local government authorized by the Land Use Act to regulate the activity," as the majority's interpretation requires. The same legislative hearing contains references to the 1973 Denver bond election and Denver's future water

diversion projects in these counties. This discussion indicates to me that the legislators were aware of these projects and intended them to come within the exemptions. *See also* Birmingham, *1974 Land Use Legislation in Colorado*, 51 Den.L.J. 467, 480 (1974) (noting the possible exemption from the Land Use Act of the Denver water projects now before us).

Thus, I would interpret the term electorate to mean the electorate of the governmental unit which was paying for the project and would be its owner. In my view, these Denver water projects are exempt from the Land Use Act.

Because of my disposition of this issue, I would not reach the constitutionality of the statute.